NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 10a0726n.06

No. 09-2354

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 18, 2010
LEONARD GREEN, Clerk

New Phoenix Sunrise
Corporation and Subsidiaries,　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Petitioner-Appellant,　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　ON APPEAL FROM THE DECISION
v.　　　　　　　　　　　　　　　　　　　)　　OF THE UNITED STATES TAX COURT
　　　　　　　　　　　　　　　　　　　　)
Commissioner of Internal Revenue,　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　Respondent-Appellee.　　　　　　 )

　　　　BEFORE:  KEITH, KENNEDY, and COOK, Circuit Judges.

　　　　**CORNELIA G. KENNEDY, Circuit Judge.**  New Phoenix Sunrise Corporation ("New Phoenix"), the taxpayer and petitioner below, appeals the decision of the tax court upholding the Commissioner's assessment of a tax deficiency of $3,355,906 and a penalty of $1,298,284 based on New Phoenix's claim of a loss of over $10 million from a pair of swap contracts that caused it an economic loss of slightly more than $100,000.  The tax court found that the transaction lacked economic substance and that New Phoenix's reliance on the advice of Jenkens & Gilchrist, the law firm that had promoted the tax shelter, did not prevent the application of the penalties.  New Phoenix challenges these rulings, as well as the disclosure, admission into evidence, and tax court's reliance on several documents that the tax court determined were related to the tax opinion prepared by Jenkens & Gilchrist in support of the challenged transaction.  Because New Phoenix's claims lack merit, we AFFIRM.

**FACTUAL AND PROCEDURAL BACKGROUND**

New Phoenix originated in the 1970s as an Arizona corporation involved in the agricultural industry. Capital Poly Bag, Inc. ("Capital"), which manufactured plastic bags, was incorporated in 1972 and became a wholly owned subsidiary of New Phoenix in 1986. Capital prospered and, in April 2001, sold its assets for over $15 million.

Timothy Wray, the president and CEO of New Phoenix as well as Capital's president, treasurer, and sole director, testified at trial that after Capital's asset sale, he sought investments for the company. In the fall of 2001, Gordon Litt, an attorney from New Phoenix's law firm, Bricker & Eckler, introduced Mr. Wray to Paul Daugerdas and John Beery of the law firm of Jenkens & Gilchrist. Daugerdas proposed that Capital engage in a series of actions known as the "Basis Leveraged Investment Swap Spread" transaction, or the BLISS transaction. The transaction involved currency speculation with the theoretical chance of a large windfall, but which also allowed a partnership engaging in the speculation to write off large paper losses on tax returns while suffering only small actual losses. Wray, acting for Capital, opted to engage in the BLISS transaction. New Phoenix ultimately paid $500,000 to Jenkens & Gilchrist, which Wray testified was for a legal opinion on the tax consequences of the BLISS transaction and not for any other services that Jenkens & Gilchrist performed.

To establish the foundations of the BLISS transaction, on or before November 19, 2001, Capital directed Jenkens & Gilchrist to set up a partnership, Olentangy Partners ("Olentangy"), in which Capital owned a 99% interest and Mr. Wray owned the remaining 1% interest.[1] Then, on or

---

[1]Because Olentangy was established for the sole purpose of engaging in the BLISS transaction, was almost entirely owned by Capital, and was controlled by Mr. Wray, just like Capital, we refer to Olentangy as Capital where possible.

about November 30, 2001, Wray simultaneously opened two separate brokerage accounts with Deutsche Banc Alex. Brown, a licensed broker-dealer engaged in the securities brokerage business in the United States and an indirect subsidiary of Deutsche Bank AG ("Deutsche Bank"). One account was on behalf of Olentangy and the other on behalf of Capital.

In December 2001, Capital and the London branch of Deutsche Bank entered into two swap contracts in execution of the BLISS transaction.[2]  In the first contract (also known as the "long contract"), Capital was to pay a premium of $10,631,250 to Deutsche Bank on December 11, 2001. Additionally, Capital was to make two fixed payments of $63 million on December 14 and December 20.  In return, Deutsche Bank provided an option that required it to pay Capital $73,631,250 if the exchange rate of the Japanese yen[3] (the "spot rate") was above 127.75 yen per dollar (the "strike price") at 10:00 a.m. on December 12, and $73,631,250 if the rate was above 128.75 yen per dollar at 10:00 a.m. on December 18.  The second contract (the "short contract") was very similar to the first, but the roles were reversed.  Deutsche Bank was to pay a premium of $10,368,750 to Capital on December 11, 2001, and two fixed payments of $63,065,625 on December 14 and December 20.  In return, Capital agreed to pay $73,500,000 if the spot rate exceeded 127.77 yen per dollar at 10:00 a.m. on December 12, and $73,500,000 if the spot rate exceeded 128.77 yen

---

[2]There is some dispute about when precisely Mr. Wray, on behalf of Capital, entered into the transaction.  Wray testified that he entered into the transaction on December 7, 2001.  However, the parties stipulated that the documents setting up the transaction were not faxed to him until December 12, and he did not sign them until December 20.  Wray did not date the documents, pursuant to advice from Jenkens & Gilchrist.

[3]Deutsche Bank gave Mr. Wray a choice of one of three currencies on which to speculate: the Japanese yen, the British pound, or the euro.  Wray, who at the time was pursuing a master's degree at Stanford University's Graduate School of Business as a Sloan Fellow, researched the currencies and testified that he believed that the yen would lose value against the dollar.

3

per dollar at 10:00 a.m. on December 18. Though the parties stylized the two contracts as "digital swap transactions," they essentially amounted to a single "digital option spread" consisting of two long-and-short-option pairs: one pair expiring on December 12, 2001 with digital levels of 127.75 yen per dollar (long) and 127.77 yen per dollar (short); the other pair expiring on December 18, 2001 with digital levels of 128.75 yen per dollar (long) and 128.77 yen per dollar (short). Capital then assigned the contracts to Olentangy.

Although the swap transactions seem to involve large sums of money, the offsetting mutual obligations reflected in the contracts were likely to result in the exchange of only relatively modest amounts of money. Consider, first, the premium and fixed payments owed under both contracts. The premiums offset except for a $262,500 remainder owed by Capital to Deutsche Bank. Similarly, the fixed payments offset to the extent of $63 million each, leaving Deutsche Bank scheduled to make two required payments of $65,625, for a total of $131,250. Therefore, at the end of the contract period, Deutsche Bank earned a $131,250 net profit, not considering the potential value of the options themselves.

There were several theoretically possible outcomes under the digital option spread. As the Commissioner explained, the first possible outcome would occur if both the long option and the short option comprising each option pair expired "out of the money"—that is, if the specified spot rate were less than the strike price of 127.75 yen per dollar on December 12 and 128.75 yen per dollar on December 18. In that case, Capital would lose its $131,250 net investment because there would be no additional net receipts on December 14 and December 20. The second possible outcome would occur if both the long option and the short option comprising each option pair expired "in the money"—that is, if the specified spot rate was equal to or greater than the strike price

4

of 127.77 yen per dollar on December 12 and 128.77 yen per dollar on December 18.  In that case, Capital would earn a profit of $131,250 on its net investment of $131,250 because it would have additional net receipts of $131,250 (the difference between Capital's $73,631,250 option and Deutsche Bank's $73,500,000 option) on both December 14 and December 20.  The third possible outcome would occur if both the long option and the short option comprising one of the option pairs expired in the money, but the long option and the short option of the other option pair expired out of the money.  Then, Capital would break even on its $131,250 net investment because it would have had an additional net receipt of $131,250 on either December 14 or December 20.  The fourth possible outcome would occur if the spot rate for one of the option pairs "hit the sweet spot," meaning that the long option and the short option comprising one of the option pairs expired in the money and out of the money, respectively.  This would happen if the spot rate on December 12 were 127.75 or 127.76 yen per dollar, or if the spot rate on December 18 were 128.75 or 128.76 yen per dollar.  Then, Capital would earn a profit of $73,500,000 on its net investment of $131,250 because it would have an additional receipt of $73,631,250 on either December 14 or December 20.  The final possible outcome would occur if both option pairs hit the sweet spot.  Then, Capital would earn a profit of $147,131,250 on its net investment of $131,250 because it would have additional receipts or $73,631,250 on both December 14 and December 20.

The parties agree that the spot price was below the strike price on both December 12 and December 18, leaving both options worthless and costing Capital its initial investment of $131,250.

Following the next step of the BLISS transaction, Olentangy purchased 8,110 shares of stock in Cisco Systems—a publicly traded company—for $149,958 on December 24, 2001.  Olentangy

5

transferred these shares to Capital three days later and dissolved.[4] Capital sold the shares almost immediately for $148,467, a $1,491 economic loss.

Jenkens & Gilchrist provided a written tax opinion dated January 9, 2002, but actually prepared June 26, 2002, in support of the BLISS transaction. This opinion was provided to the accountants who prepared New Phoenix's tax return for 2001. The opinion assumed that the BLISS transaction was entered into for non-tax reasons and argued that the transaction had economic substance. It advised that it was proper to treat the $10,631,250 premium paid to Deutsche Bank as a cost under the tax code, and therefore Capital's basis in the Cisco stock, and its corresponding loss from the sale of the stock, could be increased by that amount. It also concluded that each swap contract should be treated as a separate transaction, and that the payments received by Olentangy from Deutsche Bank did not have to be used to offset the increased basis.

New Phoenix filed its consolidated tax return for 2001 on September 19, 2002. In its return, New Phoenix claimed a loss of $10,504,462 on the sale of the Cisco stock by Capital. New Phoenix asserted that Capital had a basis of $10,652,936 in the stock due to the $10,631,250 premium ostensibly paid to Deutsche Bank for the unrealized options. Capital did not reduce this basis by the $10,368,750 premium it received from Deutsche Bank for its offsetting option contract.

The Department of the Treasury issued temporary regulations on February 28, 2000 requiring corporate taxpayers to disclose listed and other reportable transactions. Temp. Treas. Reg. § 301.6111-2T, 65 Fed. Reg. 11,215, 11,218-11,222 (Mar. 2, 2000). On August 11, 2000, the IRS issued Notice 2000-44, which was published in the Internal Revenue Bulletin on September 5, 2000. I.R.S. Notice 2000-44, 2000-36 I.R.B. 255. As the tax court stated, "[t]he notice warned taxpayers

---

[4]There were no tax consequences of this transfer. *See* I.R.C. § 731(a).

6

of transactions calling for the simultaneous purchase and sale of offsetting options which were then transferred to a partnership. The notice determined that the purported losses from such offsetting option transactions did not represent bona fide losses reflecting actual economic consequences and that the purported losses were not allowable for Federal tax purposes."

The IRS issued a notice of deficiency to New Phoenix on September 14, 2005, alleging a deficiency of $3,355,906 and a penalty under I.R.C. § 6662(a) of $1,298,284. In the explanation attached to the notice of deficiency, the IRS stated that Capital's allegation of a $10,504,462 loss was improper both because it was not actually sustained by Capital and because the BLISS transaction purportedly generating the loss was not for profit under I.R.C. § 165(c); it attributed the penalties to Capital's improper use of a tax shelter to conduct the BLISS transaction.

New Phoenix filed a petition before the tax court on December 8, 2005 appealing the Commissioner's finding of deficiency and imposition of the $1.2 million penalty. The tax court tried the matter on January 22 and 23, 2008. Over New Phoenix's assertion of attorney-client and work product privilege, the tax court compelled disclosure of and admitted into evidence several documents it concluded were related to Jenkens & Gilchrist's tax opinion. Those rulings were based on the tax court's finding that New Phoenix had waived its privilege over the subject matter of the tax opinion from Jenkens & Gilchrist by asserting its reliance on that opinion as a defense to the imposition of the penalty. On April 9, 2009, the tax court issued its decision in favor of the Commissioner. The parties stipulated to have the appeal heard by this court, *see* I.R.C. § 7482(b)(2), and New Phoenix timely exercised this right.

**DISCUSSION**

New Phoenix argues three issues on appeal.  First, New Phoenix asserts that the tax court erred in determining that the BLISS transaction was an economic sham; instead, it claims that the BLISS transaction had economic substance, rendering the tax deficiency finding improper.  Second, New Phoenix argues that the tax court erred in its application of the reasonable cause defense in Treasury Regulation § 1.6664-4. According to New Phoenix, because it reasonably relied on Jenkens & Gilchrist as to the tax consequences of the BLISS transaction, it should not be subjected to a $1,298,284 penalty.  Third, New Phoenix contends that the tax court erred in determining that certain documents were not protected under either the attorney-client privilege or the work product doctrine, ordered their disclosure improperly, and incorrectly permitted them to be introduced as evidence at trial.  We consider each of these arguments *seriatim*.

## I.  Economic Substance

New Phoenix first challenges the tax court's upholding of the Commissioner's assessment of the tax deficiency on the grounds that the BLISS transaction lacked economic substance and should therefore be disregarded for federal tax purposes.  The Commissioner argued before the tax court that Capital, after it sold its assets at a substantial taxable gain, attempted to avoid the tax consequences of that gain by engaging in the BLISS transaction, which it asserted was a multi-step transaction designed solely to generate a deductible but noneconomic loss through manipulation of the partnership basis rules.  The tax court agreed, finding that "on the basis of industry practice the BLISS transaction had no realistic probability of earning a profit" and was therefore an economic sham.  (Tax Ct. Op. at 35, JA 389.)  We review the tax court's ultimate conclusion that a transaction

8

is or is not an economic sham *de novo*, while its factual findings are reviewed for clear error. *Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (citations omitted).

"The court engages in a two-part inquiry to determine whether an asserted deduction is valid." *Rink v. Comm'r*, 47 F.3d 168, 172 (6th Cir. 1995). "The threshold question is whether the transaction has economic substance. If the answer is yes, the question becomes whether the taxpayer was motivated by profit to participate in the transaction." *Pasternak v. Comm'r*, 990 F.2d 893, 898 (6th Cir. 1993) (citations omitted). The tax court did not determine New Phoenix's subjective motivation for engaging in the BLISS transaction because it decided that the transaction lacked economic substance,[5] so we may limit our review to this threshold inquiry. "[T]he Commissioner has the authority to find [a] transaction or entity lacks economic substance and disregard it for tax purposes" when that transaction "has no valid, non-tax business purpose, [such as when it] brings about no real change in the economic relation of the taxpayers to the income in question." *Richardson v. Comm'r*, 509 F.3d 736, 741 (6th Cir. 2007) (citations and quotations omitted). This is true even when the transaction is in "formal compliance with Code provisions." *Am. Elec. Power Co. v. United States*, 326 F.3d 737, 741 (6th Cir. 2003) (citing *Knetsch v. United States*, 364 U.S. 361, 366 (1960)).

In reaching its conclusion that the BLISS transaction lacked economic substance, the tax court relied on the Commissioner's evidence that Capital could not profit from the transaction. First,

[5]There is occasional language in the tax court's opinion suggesting that it found that the subjective motivation of New Phoenix's involvement in the BLISS transaction was tax avoidance and not for profit. Nevertheless, the opinion clearly states that it is only deciding the first prong. *See* Tax Ct. Op. at 33 (holding that the transaction "lacks economic substance and fails the first prong"); *id.* at 38 ("Because we find that the transaction at issue lacked economic substance, we do not consider Mr. Wray's and Capital's profit motive in entering into the transaction."). Thus, the tax court's musings about Wray's motivations appear to be dicta.

the Commissioner offered the testimony of two expert witnesses who testified that there was a probability of 0.2% or less that the price would be within the sweet spot on at least one day. Dr. Steven Pomerantz testified there was a 95.8% chance that Capital would lose its $131,250 net investment, a 3.4% chance that Capital would break even, and a 0.6% chance that Capital would realize a $131,250 net profit on the transaction. The Commissioner argued that, after taking into account the $500,000 fee paid to Jenkens & Gilchrist, Capital would lose money on each of these scenarios, and the only way that Capital would come out ahead was if spot price hit the sweet spot on one or both of the two days.

Moreover, according to Commissioner's evidence, the tiny theoretical chance of a large payout was, in reality, illusory, because Deutsche Bank could assure that the spot rate would not hit the sweet spot in either of two ways. First, Deutsche Bank was the calculation agent of the spot rate, and the contract did not specify how the rate was to be calculated. According to Commissioner's expert witnesses, under the market convention Deutsche Bank would determine the spot rate by asking a handful of other banks for their price quotations and picking a quote from among the ones given to it. Banks always gave their quotes as a range of .03 yen, the high number being the price at which the bank would sell, and the lower value being the price at which the bank would buy. This meant that, for any given price quote, Deutsche Bank could always select a valuation that was outside of the tiny "sweet spot," which was only .02 yen wide. And, because Deutsche Bank had no fiduciary duty to Capital, as a rational actor it would never select the price in a way that would cause it to lose $74 million. Second, even if Deutsche Bank did not have discretion to set the number, it could still manipulate the spot rate through market trading. Dr. Pomerantz testified that if the yen rate was not ideal for Deutsche Bank at 10:00 a.m., the trader had 59 seconds to influence the market

10

through large trades. According to him, it would not be difficult for Deutsche Bank to move an exchange rate a few ten-thousandths for a brief period of time. Thus, there was never a risk that the spot price at 10:00 a.m. would be left within the sweet spot.

New Phoenix disputed the Commissioner's evidence regarding the BLISS transaction's potential profitability. However, the tax court resolved this issue in favor of the Commissioner. Regarding Deutsche Bank's discretion to set the spot rate, New Phoenix's expert witness, Dr. Scott Hakala, testified that market convention was to use the official rate as calculated by the Federal Reserve Bank in New York at 10:00 a.m., or, alternatively, the rate as published by either Reuters or Dow Jones. Dr. Hakala argued that Deutsche Bank was constrained by the definitions from two documents promulgated by the International Swaps and Derivatives Association, Inc. (the "ISDA") that were explicitly incorporated by the confirmation of the contracts. Dr. Hakala contended that there was a particular provision—presumably section 4.5(e)(i) of the 2000 Annex—requiring a calculation agent to average the quoted ask and sell prices when determining the spot rate, thereby eliminating the .03-yen range. Section 4.5(e)(i) also requires that, in the case of multiple quotations, the calculation agent must adopt the average of all the prices quoted, "subject to an adjustment, if any, by the Calculation Agent to reduce the effect of momentary disparities in the prices."[6] (JA

---

[6] In its reply brief, New Phoenix argues that the tax court's factual finding that Deutsche Bank had discretion to calculate the spot rate is erroneous because it ignored the ISDA documents made binding on Deutsche Bank by the contract confirmation. Following the definition of "Spot Rate" in section 1.16(e) of the 1998 FX Definition and the corresponding section of the User's Guide, New Phoenix claims that Deutsche Bank was required to determine the rate either a) as set by the confirmation, or b) in a commercially reasonable manner. However, it appears that section 1.16(e) does not even apply to the instant transaction. Section 1.16(e) only applies to "non-deliverable transactions," and transactions are deliverable unless they specify "Non-Deliverable," "cash settlement," or "In-the-Money Settlement," Because the confirmation here contains no such specification it is deemed to be a deliverable transaction, and the terms applicable to non-deliverable transactions, including section 1.16(e), are irrelevant. Moreover, even if Deutsche Bank was bound

11

1112.)  Dr. Hakala was also skeptical of Deutsche Bank's ability to manipulate the market price, describing it as "limited as best."  Dr. Hakala further testified that transactions like that between Capital and Deutsche Bank, while "not very common," do happen, "generally" on behalf of a party who trades in currencies.  However, he had never seen a transaction which had a sweet spot as narrow and the potential payout as large as this one.

In light of the "great deference" that we extend to "the Tax Court's determination pertaining to the credibility of witnesses," *Pasternak*, 990 F.2d at 900 (citations omitted), we find no error in the Tax Court's crediting the testimony of the Commissioner's experts over the testimony of New Phoenix's expert.  New Phoenix agreed that both of the Commission's experts were qualified to give an expert opinion.  Furthermore, both experts agreed that the probability of the partnership making a profit was tiny on paper and non-existent in practice.[7]  Without the opportunity to make a profit, the only consequence of the transaction to New Phoenix was a tax benefit.  This makes the transaction an economic sham, as the tax court properly concluded.  Indeed, other courts have held

---

by section 1.16(e), it was not clearly erroneous to conclude that Deutsche Bank could still manipulate the spot rate.  The plain meaning of the confirmation does not appear to require that an official rate or any particular calculation method be used.  Though New Phoenix asserts that, because the confirmation specified that the spot rate be calculated at 10:00 a.m., it implicitly required Deutsche Bank to adopt the official rate calculated by the Federal Reserve in New York at precisely that time, this contention is unavailing: just because it would be convenient to obtain a government rate at the time of valuation does not imply that doing so is required.  Therefore, because there is no indication that the parties agreed upon a valuation method, section 1.16(e) would require Deutsche Bank to use any commercially reasonable method to determine the spot rate.  The Commissioner's experts testified that prevailing commercial norms gave Deutsche Bank considerable latitude to pick a market quotation, and the tax court found this testimony to be credible.

[7] Further supporting the fact that it was a sham transaction is the fact that Mr. Wray did not sign the paperwork until December 20—*after* both valuation dates came and went.  When Wray signed the confirmation, Capital had already lost out on the contract, and there was never a chance that the options would pay out.

that similar currency option swaps lack economic substance and the Commissioner may disregard them for tax purposes. *E.g. Stobie Creek Investments LLC v. United States*, 608 F.3d 1366, 1376-77 (Fed. Cir. 2010). Without the claimed loss, New Phoenix owed an additional $3,355,906 for the tax year 2001. The tax court properly upheld the Commissioner's assessment of a deficiency.

## II. Reasonable Cause Exception

The Commissioner assessed a 40% underpayment penalty applicable to valuation misstatements of more than 400% against New Phoenix. *See* I.R.C. § 6662(h). New Phoenix seeks to avoid this penalty by invoking the reasonable cause exception outlined in Treasury Regulation § 1.6664-4, arguing that it reasonably and in good faith relied on the tax opinion it received from Jenkens & Gilchrist in claiming the loss from the BLISS transaction on its tax returns. The tax court determined that New Phoenix could not invoke the reasonable cause defense, concluding that, because Jenkens & Gilchrist "actively participated in the development, structuring, promotion, sale, and implementation of the BLISS transaction," it was unreasonable for New Phoenix to rely on the tax opinion "in the face of such a conflict of interest." We review the tax court's finding on whether a taxpayer acted with reasonable cause for clear error. *See Illes v. Comm'r*, 982 F.2d 163, 166 (6th Cir. 1992) (citations omitted).

Treasury Regulation § 1.6664-4 provides a defense to penalties "upon a showing by the taxpayer that there was reasonable cause for, and the taxpayer acted in good faith with respect to," the underpayment. Treas. Reg. § 1.6664-4; *see also* I.R.C. § 6664(c)(1). "'[T]he determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.'" *Mortensen v. Comm'r*, 440 F.3d 375, 387 (6th Cir. 2006) (quoting Treas. Reg. § 1.6664-4(b)(1)). "The most important factor in making

13

this determination is the extent of the taxpayer's effort to ascertain his proper tax liability." *Id.* "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." *United States v. Boyle*, 469 U.S. 241, 251 (1985) (emphasis omitted). Therefore, "good faith reliance on professional advice concerning the tax laws" may establish a reasonable cause defense to penalties. *Mortensen*, 440 F.3d at 387 (citations omitted). "In order for reliance on professional tax advice to be reasonable, however, the advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment." *Id.* The taxpayer has the burden of establishing that a reasonable person would have relied on the professional's advice. *Illes*, 982 F.2d at 166.

The tax court properly upheld the assessment of a penalty. The opinion letter of Jenkens & Gilchrist on which New Phoenix relied was produced by professionals who reasonably appeared to be knowledgeable about the tax law. However, the tax court made a factual finding that the attorneys of Jenkens & Gilchrist "were promoting" the tax shelter when they met Mr. Wray. The attorneys' involvement in the preparation of many of the documents needed to implement the transactions supports this finding. Because "reliance on the promoters of the investment [is] insufficient to support a good faith defense," *Mortensen*, 440 F.3d at 387, New Phoenix cannot rely on the Jenkins & Gilchrist tax opinion to avoid the payment of penalties and the tax court properly upheld the Commissioner's assessment of a $1,298,284 penalty.

14

## III.  Disclosure and Admission of Documents

New Phoenix's final argument on appeal is that the tax court improperly required the disclosure of certain documents, later admitted into evidence,[8] that it claims are subject to protection as attorney work product or under the attorney-client privilege.[9]  New Phoenix asserts that by requiring disclosure of those documents and by admitting them into evidence, the tax court committed reversible error because the tax court relied on these documents in disregarding its defenses to penalties.  The tax court admitted the documents after concluding that they were encompassed in New Phoenix's "subject-matter" waiver of any privileges applicable to material related to the Jenkins & Gilchrist tax opinion, by reason of New Phoenix's assertion of the reasonable cause defense.  We review *de novo* both the issue of whether a party has waived an evidentiary privilege and the scope of any valid waiver.  *See In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 253-54 (6th Cir. 1996).

Both the attorney-client privilege and work-product protection are waived by voluntary disclosure of private communications to third parties.  *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999); *In re Columbia/HCA Corp.*, 293 F.3d 289, 306 (6th Cir. 2002) ("[T]here is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege.").

---

[8]The tax court generally follows the rules of evidence applicable to non-jury civil proceedings in federal district court, meaning the Federal Rules of Evidence.  Tax Ct. R. 143(a).

[9]New Phoenix also contends that the exhibits were admitted without proper authentication. *See* Fed. R. Evid. 901.  Although New Phoenix objected to the admission of the exhibits on the grounds of attorney-client privilege or work product protection, it did not object on the grounds of authentication.  Therefore, it has waived any such objection, and we review it for plain error, *see* Fed. R. Evid. 103(a)(1), and conclude that any error did not affect New Phoenix's substantial rights. *See* Fed. R. Evid. 103(d).

> When the disclosure is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
>> (1) the waiver is intentional;
>> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>> (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a); *see also United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997).

New Phoenix first argues that "there is no evidence that Jenkens' [sic] opinion [in support of the BLISS transaction] was ever privileged," and therefore its disclosure did not waive any privileges protecting other documents. The attorney-client privilege attaches to confidential communications relating to any legal advice sought from a professional legal adviser in his capacity as such. *See Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998) (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)). Despite New Phoenix's contention, the tax opinion constitutes just this sort of confidential communication: it recites facts communicated by New Phoenix for that purpose of obtaining legal advice, and it contains a prominent heading on the first page indicating "CONFIDENTIAL" and "ATTORNEY-CLIENT PRIVILEGED." New Phoenix's argument that it always intended to disclose this document to its accountants and auditors does not change the document's confidential and privileged nature, because it could make such a disclosure consistent with the privilege. *See United States v. Deloitte LLP*, 610 F.3d 129, 139-41 (D.C. Cir. 2010) (holding that there was no waiver if disclosed to auditor). Nor is this ruling inconsistent with the tax court's decision that the tax opinion was not the product of a neutral advisor. The fact that the advice of the attorneys cannot be relied upon for the purpose of evading a penalty does not mean that there was not an attorney-client relationship between New Phoenix and Jenkens & Gilchrist. In other

16

words, the fact that an *attorney* has a conflict of interest does not mean that the *client* forfeits the benefit of the attorney-client privilege.

Having determined that the tax opinion was subject to the attorney-client privilege, the next question is whether New Phoenix intentionally waived that privilege with respect to the opinion and any "disclosed and undisclosed communications or information concern[ing] the same subject matter" that "ought in fairness . . . be considered" with the tax opinion. Fed. R. Evid. 502(a). The tax court correctly held that New Phoenix had voluntarily waived its privilege by raising a reasonable cause defense premised on a claim of reasonable reliance on the Jenkens & Gilchrist tax opinion. By asserting this defense, New Phoenix has put the subject matter of the tax opinion at issue, making its disclosure appropriate: "[L]itigants cannot hide behind the privilege if they are relying upon privileged communications to make their case. 'The attorney-client privilege cannot at once be used as a shield and a sword.'" *In re Lott*, 424 F.3d 446, 454 (6th Cir. 2005) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *see also Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486 (3d Cir. 1995) (holding that the attorney-client privilege may be waived by a client who asserts reliance on the advice of counsel as an affirmative defense); *In re G-I Holdings, Inc.*, 218 F.R.D. 428, 433 (D.N.J. 2003) (holding that debtors had already placed their consultations with counsel at issue through discovery responses and could not subsequently assert any privileges with respect to that subject). Therefore, New Phoenix's assertion of the reasonable cause defense waives its claims of work-product protection and attorney-client privilege with respect to any material concerning the subject matter of the tax opinion.

Nevertheless, New Phoenix asserts that this subject-matter waiver does not apply to all of the documents ordered to be disclosed and then admitted into evidence by the tax court.

17

Unquestionably, the majority of the challenged documents were related to the Jenkens & Gilchrist tax opinion in support of the BLISS transaction. As such, any privilege attached to them was waived by the reliance on that opinion to avoid the assessment of penalties. To the extent that some of the documents were unrelated to this subject matter, we need not resolve whether the tax court properly found the attorney-client privilege and work product protection waived because we conclude that their admission was clearly harmless. *See* Fed. R. Civ. P. 61; Fed. R. Evid. 103(a).

Most importantly, all of the documents subject to the tax court's disclosure order related to the subjective knowledge and motivations of New Phoenix's agents during the execution of the BLISS transaction and the preparation and filing of New Phoenix's 2001 tax return. These considerations were wholly irrelevant to the portions of the tax court's decision that New Phoenix now challenges on appeal. The tax court's finding that BLISS transaction was an economic sham was based solely on its conclusion that the transaction lacked economic substance. The holding that the reasonable cause exception did not negate the assessment of penalties against New Phoenix is supported by the tax court's determination that Jenkens & Gilchrist's conflict of interest rendered New Phoenix's reliance on the tax opinion unreasonable. For these reasons, the tax court's disclosure order and corresponding evidentiary decisions do not provide grounds to reverse its decision.

## CONCLUSION

The judgment of the United States Tax Court is AFFIRMED.