T.C. Memo. 2015-238

UNITED STATES TAX COURT

SALEH OMAR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14799-13.                          Filed December 14, 2015.

Bonnie F. Emadi, Marshall West Taylor, and Marc Jeffrey Winter, for
petitioner.

Randall L. Eager, Jr., and Sebastian Voth, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge: In a notice of deficiency respondent determined a

deficiency in petitioner's 2008 Federal income tax of $74,122 and an accuracy-

related penalty under section 6662(a) of $14,824.40. The issues for decision are:

(1) whether respondent properly determined using a bank deposits method of

[*2] reconstructing income that petitioner underreported his gross receipts on Schedule C, Profit or Loss From Business, and (2) whether petitioner is liable for an accuracy-related penalty pursuant to section 6662(a).[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and facts drawn from stipulated exhibits are incorporated herein by this reference. Petitioner resided in California when he petitioned this Court.

I.   Petitioner's Background and Fast Mart Gas & Grocery, LLC

Petitioner was born in Yemen and moved to the United States in 1978. After graduating from high school in California petitioner attended college for two years and took business administration classes but did not obtain a degree. During and after college he owned and operated several convenience and grocery stores, which he sold sometime before 2008.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar. Other adjustments to petitioner's 2008 Federal income tax as reflected in the notice of deficiency are solely computational and will not be addressed further. The notice of deficiency was also addressed to petitioner's spouse. She did not file a petition with respect to the notice of deficiency either jointly with petitioner or separately, and she is not a party to this case. See Rule 34(a)(1).

**[*3]**  Petitioner's uncle, Ghaleb Omar, owned Fast Mart Gas & Grocery, LLC (Fast Mart, LLC), which operated a convenience store and gas station in New York doing business as Fast Mart (Fast Mart).  Fast Mart had an ATM on the premises and sold lottery tickets.  Ghaleb Omar maintained four bank accounts at HSBC Bank associated with Fast Mart:  an operating account, a food stamp account, an account for ATM transactions, and an account for lottery ticket sales (collectively, Ghaleb Omar business bank accounts).  The bank accounts were designated "Ghaleb Omar dba Fast Mart", with the exception of the lottery ticket sales bank account, which was designated "Ghaleb Omar dba AA Express Mart".[2]

Before 2008 petitioner worked at Fast Mart as a manager.  While working for his uncle, petitioner performed all the banking activities for the business and had full access to the Ghaleb Omar business bank accounts.[3]

---

[2]The record does not indicate whether the business name had changed from AA Express Mart to Fast Mart.

[3]Petitioner testified that he had access to the Ghaleb Omar business bank accounts under a power of attorney because of his uncle's old age.  This testimony is not corroborated by any credible evidence.  Ghaleb Omar did not testify.

[*4]  A.   <u>Petitioner's Purchase and Operation of Fast Mart</u>

In December 2007 petitioner purchased the Fast Mart convenience store and gas station from Ghaleb Omar.[4]  Petitioner subsequently applied for various operating licenses and permits and a tax identification number for the business, which he received promptly.  He also applied for a liquor license for the business but did not obtain it until approximately March 2008.  Petitioner, however, continued to operate all aspects of the Fast Mart business from December 2007 using the existing liquor license.[5]

---

[4]Although the record is not clear, we infer from the evidence that petitioner purchased the convenience store and related assets, and not Ghaleb Omar's equitable interest in Fast Mart, LLC.  The record is also unclear as to when petitioner purchased Fast Mart.  Petitioner testified that he had purchased Fast Mart both in 2007 and in 2008.  When asked to clarify, he testified that he had purchased the business and had paid Ghaleb Omar for the business in December 2007.  He further testified that he had paid Ghaleb Omar approximately $120,000 by cashier's check for the business inventory in December 2007 but that he "probably" had paid more money to his uncle later for the buildings, the inventory, and the business.  Respondent's revenue agent also testified that during his audit of Fast Mart petitioner had told him that the purchase had occurred in December 2007.  The preponderance of the evidence suggests a finding that petitioner purchased Fast Mart in December 2007.

[5]Petitioner testified that he could not operate the business without the liquor license and that Ghaleb Omar had remained the named owner and operator of Fast Mart until petitioner had obtained the liquor license.  This testimony is not supported by any credible evidence in the record, and we are not convinced that it is true.

**[\*5]**  The Ghaleb Omar business bank accounts were the only bank accounts associated with Fast Mart until March 2008.  Once petitioner had obtained the liquor license in March 2008 he opened his own business bank accounts at HSBC Bank.  He opened an operating bank account, a food stamp bank account, a bank account for ATM transactions, and a bank account for lottery ticket sales (collectively, Fast Mart business bank accounts).  These bank accounts were all designated "Fast Mart Gas and Grocery" or "Fast Mart Gas and Grocery LLC".

In 2008 Fast Mart accepted only cash and food stamps as forms of payment.  Fast Mart also operated the ATM and sold lottery tickets during 2008 and generated income from these activities.[6]  Additionally, when tobacco companies

[6]Petitioner testified that he received a commission of 75 cents for each ATM transaction and estimated a commission of 3% of lottery ticket sales.  Petitioner further testified that he received a monthly commission check and a monthly statement from the ATM collection agency showing the amounts of his commission and that he either deposited the commission checks into a bank account or endorsed them over to a vendor without depositing them.  Petitioner also testified that he deposited lottery ticket sale proceeds into the lottery bank account; that New York State drafted the proceeds from the lottery bank account every week; and that he received a commission check from New York State every week.  He estimated that he had received between $10,000 and $15,000 in lottery ticket sales commissions in 2008.  However, the revenue agent identified only $2,432 of deposits from the New York lottery into the business bank accounts in 2008, comprising (1) $1,600 into the Fast Mart operating bank account on May 8, 2008; (2) $378 into the Ghaleb Omar lottery bank account on June 4, 2008; and (3) $130 and $324 into the Fast Mart lottery bank account on December 3 and 31, 2008, respectively.  Petitioner did not introduce the commission checks or

(continued...)

[*6] wanted to promote their cigarettes, Fast Mart sold the cigarettes at a discounted price and received a check from the tobacco companies for the difference between the discounted price and the original price. Petitioner deposited at least some of these checks into the Ghaleb Omar and Fast Mart business bank accounts.

Petitioner worked at Fast Mart in 2008 and received a weekly salary of $400. He also paid one employee to work at the store. Petitioner paid both his and his employee's salary from cash that he took from the cash register. He also, at least occasionally, paid vendors in cash. He deposited the remaining cash weekly.

B.    Continued Use of the Ghaleb Omar Business Bank Accounts

Even after petitioner had opened his new Fast Mart business bank accounts, he continued to make substantial deposits into and withdrawals from the Ghaleb Omar business bank accounts. The account activity before and after March 2008 was similar. For example, petitioner deposited several payments from tobacco companies into the Ghaleb Omar ATM bank account on May 27, 2008. Petitioner made payments to Norco Energy Corp. (Norco Energy), Fast Mart's fuel supplier,

---

[6](...continued)
statements into evidence.

[*7] from the Ghaleb Omar operating bank account in similar amounts several times a month from January until May 2008. Petitioner paid New York State employment taxes from the Ghaleb Omar food stamp bank account on June 11, 2008. Further, New York State drafted funds from the Ghaleb Omar lottery bank account until July 16, 2008.[7]

Petitioner's testimony about the use of the Ghaleb Omar business bank accounts, which is not corroborated by any credible evidence, was contradictory and vague. We do not find it credible.[8]

---

[7]The Ghaleb Omar ATM bank account and the Ghaleb Omar lottery bank account were active until at least August 15, 2008. The Ghaleb Omar operating bank account was active until at least May 8, 2008. The Ghaleb Omar food stamp bank account was active until at least October 24, 2008.

[8]Petitioner testified that before March 2008 he had performed all the banking activities for the Ghaleb Omar business bank accounts, including making deposits, using the power of attorney for his uncle unless his uncle needed to go to the bank to approve a change or sign a document. Petitioner also testified that Ghaleb Omar had closed the Ghaleb Omar business bank accounts in March 2008 but also testified: "I really don't remember if he closed the account after I open [sic] mine." He further testified that there were no business-related deposits into the Ghaleb Omar business bank accounts after March 2008; that he did not have access to those bank accounts after March 2008; that he did not know whether his uncle had deposited money into those bank accounts after March 2008; and that Ghaleb Omar had received the benefit of any deposits into those bank accounts after March 2008. When asked how his uncle would have accessed the money in those bank accounts, petitioner stated: "I have no idea. Maybe I took the money and transferred to him, or I withdraw [sic] and take the money and give it to him. I'm not sure. My uncle was an old man, and I used to do the banking and

(continued...)

**[\*8]** II.     Petitioner's Federal Income Tax Liability and Respondent's Examination

Petitioner hired an accountant to prepare his Federal income tax return for the 2008 taxable year. Petitioner's timely filed return included a Schedule C for Fast Mart, which he operated as a sole proprietorship, reflecting gross receipts of $5,181,251. Although petitioner testified that he had kept monthly ledgers and had provided the accountant with income and expense summaries and invoices for the business, he did not provide the accountant with any bank records showing deposits into the business bank accounts, and the monthly ledgers and income and expense summaries, if they exist, are not a part of the record.

Revenue Agent David Krysztof (Revenue Agent Krysztof) conducted an examination of petitioner's 2008 Federal income tax return. In January 2010 he conducted an initial interview with petitioner during which he requested financial books and records. After petitioner failed to provide the financial books and records, Revenue Agent Krysztof summoned the 2008 bank records from HSBC Bank. He subsequently conducted a bank deposits analysis with respect to the eight business bank accounts.

---

[8](...continued)
everything for him."

[*9]   Revenue Agent Krysztof began his analysis of each bank account by listing every deposit made into the bank account.  He then identified the deposits that appeared to be taxable, separately identifying cash deposits and deposits attributable to certain vendors such as Frito Lay, Lorillard Tobacco Co., Phillip Morris, and RJ Reynolds.  In calculating the deposits, Revenue Agent Krysztof listed and analyzed the withdrawals from each account and determined that certain withdrawals or adjustments, e.g., cash used to replenish the ATM, lottery payments transferred to the lottery authority, returned checks, and bank adjustments, should be treated as nontaxable deposits.

Revenue Agent Krysztof summarized his bank deposits analysis as follows:

| Account | Total deposits (excluding deposits in column 3) | Total deposits from tobacco companies and Frito Lay | Withdrawals |
|---|---|---|---|
| Ghaleb Omar ATM | $106,922 | $1,089 | $121,968 |
| Fast Mart ATM | 66,420 | -0- | 68,930 |
| Ghaleb Omar operating | 2,092,848 | 104 | 108,765 |
| Fast Mart operating | 4,141,080 | 1,495 | 172 |
| Ghaleb Omar food stamp | 64,210 | 531 | 23,706 |
| Fast Mart food stamp | 29,377 | -0- | 20,566 |
| Ghaleb Omar lottery | 58,751 | 1,774 | 67,376 |
| Fast Mart lottery | 48,555 | 1,119 | 37,262 |
| Total | 6,608,163 | 6,112 | 448,745 |

**[*10]** Revenue Agent Krysztof then calculated the gross income/receipts from the eight business bank accounts by adding up the withdrawals that he concluded represented nontaxable deposits and subtracting that amount, along with New York State sales tax payments of $100,705, from the total deposits. He therefore calculated petitioner's gross income/receipts to be $6,064,823.

Revenue Agent Krysztof determined that total deposits in 2008, less the withdrawals that he treated as nontaxable deposits, into the eight bank accounts constituted taxable income to petitioner. On May 21, 2013, respondent issued petitioner a notice of deficiency in which respondent determined, inter alia, that petitioner (1) had unreported gross income/receipts of $883,572, (2) was entitled to an additional deduction of $697,472 for business expenses,[9] and (3) was liable for a $74,122 income tax deficiency and a $14,824.40 section 6662(a) accuracy-related penalty for 2008.

---

[9]These additional business expenses primarily represented amounts that petitioner paid to Norco Energy as reflected in the bank records but did not claim on his 2008 Federal income tax return. While cross-examining the revenue agent at trial, petitioner claimed he had received a "report" from Norco Energy showing expenses of $10,900,059, which is greater than the amount that respondent allowed. However, this report was not introduced into evidence.

**[\*11]**                              OPINION

I.     The Presumption of Correctness and the Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving that the determination is improper. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, if a taxpayer produces credible evidence[10] with respect to any factual issue relevant to ascertaining the taxpayer's liability for any tax imposed by subtitle A or B of the Code and satisfies the requirements of section 7491(a)(2), the burden of proof on any such issue shifts to the Commissioner. Sec. 7491(a)(1). Section 7491(a)(2) requires a taxpayer to demonstrate that he or she (1) complied with the requirements under the Code to substantiate any item, (2) maintained all records required under the Code, and (3) cooperated with reasonable requests by the Secretary[11] for witnesses, information, documents,

---

[10]"Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)." Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

[11]The term "Secretary" means the Secretary of the Treasury or his delegate. Sec. 7701(a)(11)(B).

[*12] meetings, and interviews.  See also Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

The U.S. Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), (2), has held that for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must establish some evidentiary foundation connecting the taxpayer with the income-producing activity, see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977), or demonstrating that the taxpayer actually received unreported income, Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982).  If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the unreported income adjustment was arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97.

Petitioner purchased Fast Mart from his uncle in December 2007.  Although petitioner asserts various explanations for why some of the unreported income for 2008 is not attributable to him, see infra pp. 16-17, respondent has established the necessary evidentiary foundation linking petitioner to the income-producing

[*13] activity and to the business bank accounts for 2008. See Edwards v. Commissioner, 680 F.2d at 1271 ("It is undisputed that * * * [the taxpayer] owned an income-generating * * * business during the years in question. Therefore, the Commissioner was entitled to rely on the presumption."). The presumption of correctness stands, and petitioner bears the burden of proving that respondent's determination is incorrect unless he demonstrates that the burden of proof should shift to respondent under section 7491(a)(1) and (2). Petitioner does not contend that he met the requirements of section 7491(a), and the record confirms that he did not do so. Accordingly, the burden of proof remains on petitioner.

II.  Bank Deposits Analysis

Gross income includes "all income from whatever source derived", including income derived from business. Sec. 61(a)(2). A taxpayer must maintain books and records establishing the amount of his or her gross income. See sec. 6001; Petzoldt v. Commissioner, 92 T.C. 661, 686 (1989); sec. 1.446-1(a)(4), Income Tax Regs. When a taxpayer fails to keep adequate books and records, the Commissioner is authorized to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. Sec. 446(b); Petzoldt v. Commissioner, 92 T.C. at 693. The Commissioner may use indirect methods, and he has latitude in determining which method of reconstruction to

**[*14]** apply when a taxpayer fails to maintain adequate books and records. Petzoldt v. Commissioner, 92 T.C. at 693. The Commissioner's reconstruction of a taxpayer's income need only be reasonable in the light of all surrounding facts and circumstances. Schroeder v. Commissioner, 40 T.C. 30, 33 (1963); see also Giddio v. Commissioner, 54 T.C. 1530, 1533 (1970). The method of reconstruction that the Commissioner uses is not invalidated solely because the Commissioner's income determination may not be completely correct. Halle v. Commissioner, 175 F.2d 500, 502-503 (2d Cir. 1949), aff'g 7 T.C. 245 (1946); DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992).

Respondent used the bank deposits method because petitioner failed to maintain or produce for examination adequate books and records for the year at issue. A bank deposit is prima facie evidence of income. DiLeo v. Commissioner, 96 T.C. at 868; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). The bank deposits method of reconstruction assumes that all of the money deposited into a taxpayer's account is taxable income unless the taxpayer can show that the deposits are nontaxable. See DiLeo v. Commissioner, 96 T.C. at 868; see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964). The Commissioner need not show a likely source of the income when using the bank deposits method, but

**[\*15]** the Commissioner must take into account any nontaxable items or deductible expenses of which the Commissioner has knowledge.  See Price, 335 F.2d at 677; Tokarski v. Commissioner, 87 T.C. at 77.  After the Commissioner reconstructs a taxpayer's income using the bank deposits method and determines a deficiency, the taxpayer bears the burden of proving respondent's analysis and deficiency amount are erroneous.  See Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, 96 T.C. at 883.  The taxpayer may prove that the Commissioner's reconstruction of his income is in error, in whole or in part, by proving that a deposit is nontaxable.  See Clayton v. Commissioner, 102 T.C. at 645.

During the investigation Revenue Agent Krysztof asked petitioner for Fast Mart's business books and records, but petitioner never produced them.  Revenue Agent Krysztof subsequently summoned bank records directly from HSBC bank and prepared a bank deposits analysis on which respondent's determination of an income tax deficiency is based.  Respondent reasonably relied on the bank deposits method to determine petitioner's taxable income and the resulting income tax deficiency.  Because petitioner bears the burden of proving that respondent's bank deposits analysis is erroneous, petitioner must prove that respondent erred in

[*16] preparing it.  See sec. 446(b); Petzoldt v. Commissioner, 92 T.C. at 693; sec. 1.446-1(b)(1), Income Tax Regs.

A.    Whether the Bank Deposits Constituted Gross Income to Petitioner

Respondent determined that an analysis of the deposits into the Ghaleb Omar business bank accounts and into the Fast Mart business bank accounts for 2008 shows that petitioner underreported his Schedule C gross income.  Petitioner disagrees.

Gross income includes all accessions to wealth over which a taxpayer has complete dominion.  See James v. United States, 366 U.S. 213, 219 (1961); Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).  We generally have held that when the Commissioner uses the bank deposits method to reconstruct a taxpayer's income, the taxpayer's gross income includes deposits into all accounts over which the taxpayer has dominion and control, not just deposits into accounts titled in the taxpayer's name.  See, e.g., Price v. Commissioner, T.C. Memo. 2004-103; Cohen v. Commissioner, T.C. Memo. 2003-42; Woodall v. Commissioner, T.C. Memo. 2002-318; Woods v. Commissioner, T.C. Memo. 1989-611, aff'd without published opinion, 929 F.2d 702 (6th Cir. 1991).  A taxpayer has dominion and control over an account when

[*17] the taxpayer has the freedom to use its funds at will.  See Rutkin v. United States, 343 U.S. 130, 136-137 (1952).

Petitioner clearly had dominion and control over the Fast Mart business bank accounts, which he opened in March 2008.  The issue is whether petitioner also had dominion and control over the Ghaleb Omar business bank accounts in 2008 such that the deposits into those accounts are properly attributable to him.

Petitioner advances two explanations as to why the deposits into the Ghaleb Omar business bank accounts are not his income.  Petitioner contends that the deposits from January to March 2008 are not attributable to him because, although he purchased the business from his uncle in 2007, he did not begin operating the business until March 2008 because that is when he obtained a liquor license in his name and opened the Fast Mart business bank accounts in his name.  Although petitioner handled all of the banking for the business during that time, he asserts that before March 2008 he was acting solely under a power of attorney for his uncle, who could not perform banking activities because of his advanced age. Petitioner further asserts that any deposits into the Ghaleb Omar business bank accounts after March 2008 are not attributable to him because he had opened his own business bank accounts, he believed his uncle had closed the Ghaleb Omar business bank accounts, he was not involved with any of the banking activities

**[\*18]** with respect to those bank accounts after March 2008, and any deposits into those bank accounts after March 2008 were not business related.

Petitioner did not introduce any documents such as withdrawal slips, copies of endorsed checks, proof of signatory authority over the Ghaleb Omar business bank accounts, or other credible evidence that would prove either that he did not make the deposits or that he made them on behalf on his uncle pursuant to a credible agreement to acquire the business. Petitioner purchased the business in 2007. He did not introduce a sales contract or other credible evidence to prove that the gross receipts generated by the business after the purchase should be attributed to his uncle. The record does not contain a copy of the alleged power of attorney, and Ghaleb Omar did not testify.

Moreover, contrary to petitioner's testimony,[12] Ghaleb Omar's business bank accounts were not closed in March 2008. The Ghaleb Omar operating bank account was active until at least May 8, 2008. The Ghaleb Omar ATM bank account and the Ghaleb Omar lottery bank account were active until at least August 15, 2008. The Ghaleb Omar food stamp bank account was active until at least October 24, 2008. Each had frequent, substantial deposits and withdrawals

---

[12]Petitioner testified both that his uncle's bank accounts were closed in March 2008 and that he did not know whether they were closed because he did not have any involvement with the bank accounts after that time.

**[*19]** after March 2008 consistent with the operation of an ongoing business and consistent with the deposits into and withdrawals from those bank accounts between January and March 2008. Moreover, we decline to credit petitioner's testimony that his uncle's advanced age prevented him from doing any banking before March 2008 but that his uncle was responsible for all of the account activity after that time. The frequency and nature of the deposits into and withdrawals from the Ghaleb Omar business bank accounts clearly indicate that petitioner continued to use those bank accounts for Fast Mart well after March 2008. We find that petitioner exercised dominion and control over the Ghaleb Omar bank accounts during the entire 2008 year in his personal capacity, rather than under a power of attorney for his uncle, and that the deposits into those accounts are properly attributable to him.

B.     Whether the Bank Deposits Analysis Is Erroneous

We next determine whether the revenue agent's bank deposits analysis is in error. The parties stipulated the amounts of the total deposits into each Ghaleb Omar business bank account and each Fast Mart business bank account. However, the stipulated totals did not include deposits into the bank accounts from Frito Lay and the tobacco companies, which Revenue Agent Krysztof tracked in a separate chart within his bank deposits analysis summary. See table supra p. 9. Because

**[\*20]** the bank deposits analysis summary clearly indicates that the stipulated totals did not include these deposits, we disregard the stipulations and find that, consistent with the bank deposits analysis summary and the notice of deficiency, the deposits into the business bank accounts totaled $6,614,275. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989); Jasionowski v. Commissioner, 66 T.C. 312, 317-318 (1976).

Petitioner contends that the bank deposits analysis is inaccurate because (1) the business had a greater cost of goods sold than respondent allowed, (2) the business paid New York State sales tax in an amount greater than respondent allowed, and (3) respondent improperly determined that the deposits into the ATM and lottery bank accounts were taxable.

First, petitioner contends that he is entitled to a greater cost of goods sold with respect to amounts allegedly incurred or paid to Norco Energy for fuel. In performing the bank deposits analysis, the revenue agent allowed petitioner a cost of goods sold with respect to Norco Energy expenses in an amount equal to the total payments to Norco Energy in 2008 as reflected in the bank records. While cross-examining the revenue agent at trial, petitioner claimed he had received a "report" from Norco Energy showing expenses of $10,900,059, which is greater than the amount that respondent allowed. However, this "report" was never

[*21] introduced into evidence, and nothing in the record proves the amount that petitioner, as a cash basis taxpayer, actually paid to Norco Energy in 2008. To the extent that petitioner claims he should receive a reduction of gross receipts for amounts allegedly paid to Norco Energy with cash taken directly from the cash register, petitioner failed to properly substantiate those expenses with any credible evidence, see sec. 6001; sec. 1.6001-1(a), Income Tax Regs., and petitioner would not be entitled to cost of goods sold in any event because any cash taken directly from the register would not have been included in the revenue agent's calculation of gross income. Therefore, petitioner is not entitled to a cost of goods sold in an amount greater than respondent allowed.

Petitioner similarly claims that he is entitled to a deduction for State sales tax in an amount greater than respondent allowed. At trial petitioner provided for the first time quarterly State and local sales and use tax returns for part of 2007 and for 2008, which he claims proved that he paid $132,000 in State sales tax for 2008. However, those documents were not admitted into evidence because they were not exchanged in accordance with the Court's standing pretrial order. Petitioner has not properly substantiated this claimed expense, and he is not entitled to a State sales tax deduction in a greater amount than respondent allowed. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

[*22] Petitioner also contends that respondent's bank deposits analysis is inaccurate with respect to the Ghaleb Omar and Fast Mart ATM and lottery bank accounts.[13] Revenue Agent Krysztof calculated the taxable income with respect to these four bank accounts by tallying the total deposits into the bank accounts and reducing the total deposits by the amounts of certain withdrawals from the bank accounts. See supra pp. 9-10. Petitioner assigns error to this method. He contends that (1) only the commissions that he earned on the ATM transactions and the lottery ticket sales are taxable income and (2) his taxable income should not be calculated with reference to the deposits into those bank accounts because the deposited amounts belonged to the ATM company or the State of New York, not to him.

Petitioner appears to be confused by the results of the bank deposits analysis. The amounts of the withdrawals from the ATM bank accounts, presumably paid over to the ATM company or used to replenish the ATM machine, that Revenue Agent Krysztof treated as nontaxable deposits exceeded the total deposits into the ATM bank accounts.[14] Therefore, Revenue Agent

---

[13]The deposits into the Ghaleb Omar business bank accounts are attributable to petitioner. See supra p. 19.

[14]Total deposits into and total withdrawals from the Ghaleb Omar ATM

(continued...)

[*23] Krysztof's calculation of taxable income did not include any amounts deposited into the ATM bank accounts; in fact, the excess withdrawals from the ATM bank accounts offset deposits into other bank accounts, which benefited petitioner. Moreover, petitioner has not identified any entry in the bank deposits analysis that represented a commission from the ATM company and has not provided any credible evidence of the amount of the commission.

With respect to the two lottery bank accounts, total deposits exceeded the amounts of the withdrawals presumably paid to the State of New York by $5,561.[15] Of this amount, $2,893 represented payments from tobacco and cigarette companies rather than proceeds from lottery ticket sales. Therefore, Revenue Agent Krysztof calculated petitioner's taxable lottery income deposited into the

---

[14](...continued)
bank account were $108,011 and $121,968, respectively. The deposits included not just amounts from ATM transactions but payments from tobacco and cigarette companies as well. Total deposits into and total withdrawals from the Fast Mart ATM bank account were $66,420 and $68,930, respectively. See table supra p. 9.

[15]The total deposits into and the total withdrawals from the Ghaleb Omar lottery bank account were $60,525 and $67,376, respectively. The total deposits into and the total withdrawals from the Fast Mart lottery bank account were $49,674 and $37,262, respectively. The deposits included not just amounts from the sale of lottery tickets but payments from tobacco and cigarette companies as well. See table supra p. 9.

**[*24]** lottery bank accounts to be $2,668.[16]  Even if we were to accept petitioner's contention that only his commissions from the lottery ticket sales should constitute taxable income, petitioner estimated that his lottery ticket sales commissions totaled between $10,000 and $15,000 for 2008.  Petitioner is therefore arguing against himself and has not shown that the bank deposits analysis was in error.

In conclusion, petitioner has not substantiated any additional cost of goods sold or State sales tax deduction, and any alleged inaccuracy in respondent's bank deposits analysis is favorable to petitioner.  Accordingly, we uphold respondent's bank deposits analysis and his determination of taxable Schedule C income derived from that analysis.

III.    Accuracy-Related Penalty Under Section 6662(a)

Section 6662(a) and (b)(1) and (2) authorizes the Commissioner to impose a 20% penalty on an underpayment of tax that is attributable to (1) negligence or disregard of rules or regulations or (2) any substantial understatement of income tax.  Only one section 6662 accuracy-related penalty may be imposed with respect to any given portion of an underpayment.  New Phoenix Sunrise Corp. v.

---

[16]This amount does not include the $1,600 payment from the New York lottery deposited into the Fast Mart operating bank account on May 8, 2008.  See supra note 6.

**[\*25]** <u>Commissioner</u>, 132 T.C. 161, 187 (2009), <u>aff'd</u>, 408 F. App'x 908 (6th Cir. 2010); sec. 1.6662-2(c), Income Tax Regs.

The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.  "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.  Disregard of rules or regulations "is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and "is 'reckless' if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe."  <u>Id.</u> subpara. (2); <u>see also</u> <u>Neely v.</u> <u>Commissioner</u>, 85 T.C. 934, 947 (1985).  An understatement means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate.  Sec. 6662(d)(2)(A).  An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

[*26] The accuracy-related penalty does not apply with respect to any portion of the underpayment for which the taxpayer shows that there was reasonable cause and that he or she acted in good faith. Sec. 6664(c)(1). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

The Commissioner bears the burden of production with respect to the taxpayer's liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446-447. Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. See Higbee v. Commissioner, 116 T.C. at 446-447.

Petitioner failed to report a large amount of his income on his 2008 Federal income tax return and failed to maintain and/or provide to respondent adequate

**[*27]** business books and records. <u>See</u> sec. 1.6662-3(b)(1), Income Tax Regs. The resulting underpayment of petitioner's Federal income tax is the product of petitioner's negligence and disregard of rules and regulations. Respondent has, therefore, met his burden of producing evidence showing that a section 6662(a) penalty for an underpayment of tax attributable to negligence or disregard of rules or regulations is appropriate. Further, petitioner's accountant who prepared the 2008 return did not testify, and petitioner's testimony with respect to the records and information that he provided to the accountant was confusing and vague. He therefore has not produced any credible evidence that he acted with reasonable cause and in good faith with respect to the underpayment. Accordingly, petitioner is liable for a section 6662(a) penalty for an underpayment of tax attributable to negligence or disregard of rules or regulations.

We have considered the parties' remaining arguments, and to the extent not discussed above, conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.