*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0473p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HOMER L. RICHARDSON and GLORIA M.
RICHARDSON,

*Petitioners,*

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent.*

No. 06-1963

---

On Appeal from the United States Tax Court.
Nos. 03-16794; 03-16795.

Argued: October 22, 2007

Decided and Filed: December 11, 2007

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

---

### COUNSEL

---

**ARGUED:** Robert Alan Jones, Las Vegas, Nevada, for Petitioners. Andrea R. Tebbets, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Robert Alan Jones, Las Vegas, Nevada, for Petitioners. Andrea R. Tebbets, Joan I. Oppenheimer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

### OPINION

---

SUTTON, Circuit Judge. This appeal arises from income tax deficiencies and fraud-penalty assessments levied by the IRS and upheld by the Tax Court. Because the Tax Court did not clearly err (1) in finding that Homer Richardson fraudulently created sham trusts and underreported the couple's income and (2) in finding that Gloria Richardson failed to show that she was entitled to innocent-spouse relief, we affirm.

I.

Homer and Gloria Richardson spent most of their careers as hardworking and traditional, though perhaps reluctant, taxpayers. Gloria worked as a medical assistant. Homer, a graduate of the University of Missouri, managed drug stores for twelve years and ran a tool business for three. After abandoning the tool business, Homer obtained licenses to sell insurance and securities.

1

In late 1995, the Richardsons met representatives of the Aegis Company, who promoted several business-trust packages and the trusts' capacities to reduce taxes. Homer set up his own tax-reduction trust in August 1996 and that same year began peddling the Aegis trust packages to others. Homer targeted self-employed insurance agents and conducted informational workshops where he told attendees they could reduce their taxes by up to 70% if they used the Aegis system. He boasted that customers "could leave more money for [their] children," JA 966, and that they "essentially would become [their] own charit[ies]" using the money in their trust as a "retirement plan," JA 971. Homer sold the trust packages for $11,000 apiece, and his success in marketing them generated considerable income—gross receipts of $516,309 in 1996 and $455,750 in 1997.

In the face of this new wealth, the Richardsons created two new trusts for themselves, the HG Asset Management Company (the "business trust") and the HG Richardson Charitable Trust (the "charitable trust"). Although the trust instrument for the charitable trust prohibited transactions that were not to "charitable organizations" or would otherwise "jeopardize the federal income tax exemption of [the] trust pursuant to section 501(c)(3) of the Internal Revenue Code," JA 399–400, the Richardsons never sought § 501(c)(3) tax-exempt status for the trust. The Richardsons transferred all of their assets, including their personal residence, and all rights in their future income to the business trust in exchange for $10 and a full ownership interest in both trusts. The Richardsons maintained exclusive control over the funds of both trusts, and they named their four children as successor directors and beneficiaries of the business trust. Homer served as the Executive Director and Executive Trustee of the business and charitable trusts, and Gloria served as the Executive Secretary of each trust.

For the first six days of the trusts' existence, an Aegis associate served as a director of the business trust, but the Richardsons were otherwise the trusts' lone directors and trustees. Neither trust had any employees, and Homer made all of the day-to-day investment decisions. The Richardsons' tax returns say that Gloria spent two hours a week working for the charitable trust.

Although the Richardsons transferred all of their assets to the business trust, their lifestyle did not change. In exchange for the Richardsons' services, the business trust contractually provided them with housing, transportation, health care, educational and "incidental expenses." JA 335ae. The rationale for "maintain[ing] adequate housing," the contract with the business trust explained, was that "[t]he law says that the rental value of a residence which is maintained for the convenience of any employer is generally not taxable." JA 335ad. In this case, the "adequate housing" the trust provided was their long-time residence. The couple, in their capacity as trust directors, also authorized expenditures from the business trust to remodel their home and to purchase a car (titled in Homer's name).

In 1996 and 1997, the Richardsons filed joint personal tax returns and a separate Form 1041 (Income Tax Return for Estates and Trusts) for the business trust. On their personal returns, they reported only Homer's insurance-sales receipts ($11,069 for 1996 and $9,694 for 1997), and after taking the standard deduction and two exemptions, they reported no taxable income for either year. They opted to report their far more substantial Aegis income (a combined total of nearly one million dollars of gross income for 1996 and 1997) on the business trust's returns and managed to reduce the trust's taxable income to zero through a series of deductions. The business trust claimed deductions for the Richardsons' personal living expenses, their health insurance, their homeowners insurance, their car payments, depreciation on their residence and certain fiduciary fees. The business trust then took charitable deductions for the balance of its income ($259,880 in 1996 and $51,299 in 1997) based upon transfers to the charitable trust. The Richardsons did not file a tax return in 1996 for the charitable trust, but in 1997 and 1998 they reported the business trust's charitable contributions on a Form 990-PF (Return of Private Foundation).

The Richardsons had several opportunities to consider the legitimacy of the trusts and their tax returns. At a "board meeting" on June 27, 1997, they discussed IRS Notice 97–24, which warned taxpayers about the illegality of abusive trusts. The Notice said that "[a]busive trust arrangements often use trusts to hide the true ownership of assets and income or to disguise the substance of transactions," "frequently involve more than one trust" and "purport to involve charitable purposes." I.R.S. Notice 97–24, 1997-16 I.R.B. 6, 6 (Apr. 21, 1997). The IRS Notice characterized a business trust as abusive when the trust "makes payments to the trust unit holders or to other trusts created by the owner (characterized either as deductible business expenses or as deductible distributions)." *Id.* And it explained the legal principles behind the tax treatment of abusive trusts and threatened severe penalties against those who utilized or promoted them. *Id.* at 7. At this board meeting, the Richardsons allegedly consulted legal research about this IRS Notice, provided by Aegis, and determined that "the Aegis business trust is [not] the kind of trust that is addressed." JA 335az.

At some point between 1999 and early 2001, Missy Vaselaney, an attorney hired by some of Homer's clients to help them close their Aegis trusts, told Homer that the Aegis schemes were illegal. Homer dismissed her advice because she "was not a tax expert as far as trusts were concerned." JA 903. Although Homer said that he had consulted other lawyers, he never provided the name of a lawyer not affiliated with Aegis.

On July 13, 1999, the IRS sent the Richardsons a copy of Notice 97–24, advised them that they might be involved in an abusive trust and gave them an opportunity to correct their tax returns. The letter asked the Richardsons to send the IRS their trust documents, but instead of complying with the inquiry Homer questioned the agents' authority to look into the trusts and failed to attend an appointment with IRS agents to discuss the trusts.

After the Richardsons refused to cooperate, the IRS audited them and issued a series of third-party summonses to obtain the Richardsons' financial records. Homer responded to these summonses by threatening his banks with lawsuits if they disclosed any information, by threatening to sue an IRS agent because he had "had enough" of the agent's "lawless disregard for [his] rights," JA 505, and by filing a motion to quash in the district court.

After the district court denied this motion, the civil investigation lay dormant for two years while the IRS commenced a criminal investigation of the Richardsons. The IRS resumed the civil investigation in 2002. The Richardsons continued to challenge the IRS agents' authority to investigate them and failed to furnish any of the requested documents to the agents. In July, the IRS issued the Richardsons two deficiency notices ($164,442 for 1996 and $123,848 for 1997), asserting that the trusts were sham entities, attributing all of the couple's Aegis income to them and making the income taxable to them personally. In addition to assessing joint tax liabilities, the notices charged Homer individually with fraud penalties of $123,077 for his 1996 tax filings and $92,886 for his 1997 tax filings. Through all of this, Homer's "point of view," as described by one of his clients, "was to stick with it and continue to try to fight it because . . . we're in the tax protesting mode." JA 982.

The Richardsons challenged the deficiency findings in the Tax Court. They argued that (1) the invalidation of the business trust as a sham entity violated Ohio law and the Tenth Amendment to the U.S. Constitution; (2) the trusts were not sham entities; (3) the fraud penalty against Homer was insufficiently supported; (4) the statute of limitations barred the assessment because there was no fraud; and (5) Gloria was entitled to innocent-spouse relief. The Tax Court upheld all of the Commisioner's findings.

II.

The Richardsons appeal the tax deficiencies and fraud penalties levied against them. Because the Tax Court's fraud, economic-substance and innocent-spouse rulings are factual ones, we review them for clear error, "giv[ing] deference to the Tax Court's factual findings and inferences." *Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 777 (6th Cir. 2006).

A.

The Internal Revenue Code requires taxpayers to report "all income from whatever source derived," including "income derived from business" and "[i]ncome from an interest in an estate or trust." 26 U.S.C. § 61(a)(2), (15). In determining whether to attribute income to a taxpayer, the Code elevates substance over form, asking not what the surface of a transaction suggests but what the economic realities of the transaction show. *See Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945). Because even the most "patriotic" citizens do not have a "duty to increase [their] taxes," *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), it "is entirely legal and legitimate" to minimize taxes through permissible means, *Estate of Kluener v. Comm'r*, 154 F.3d 630, 634 (6th Cir. 1998). But if a transaction or entity has no "valid, non-tax business purpose," *id.*, nominally uses another person or entity "as a conduit through which to pass title," *Court Holding Co.*, 324 U.S. at 334, or "br[ings] about no real change in the economic relation of the [taxpayers] to the income in question," *Comm'r v. Tower*, 327 U.S. 280, 291 (1946), the Commissioner has the authority to find that the transaction or entity lacks economic substance and disregard it for tax purposes, *see Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1354 (Fed. Cir. 2006) (characterizing the economic-substance doctrine as "a judicial tool for effectuating the underlying Congressional purpose that, despite literal compliance with the statute, tax benefits not be afforded based on transactions lacking in economic substance").

In ascertaining whether a trust has economic substance, courts look to a variety of factors: (1) whether the relationship of the grantors to the transferred property changed materially; (2) whether any independent trustee exists to prevent the grantors from acting solely in their own interests; (3) whether any economic interest in the trust assets passed to other beneficiaries; and (4) whether the trust imposes any restrictions on the grantors' use of the assets. *See Markosian v. Comm'r*, 73 T.C. 1235, 1243–44 (1980). Applying these principles, the Tax Court concluded that the Richardsons' trusts lacked economic substance, finding that "the relationship of petitioners to both their physical assets and their income-producing activities remained essentially unchanged" after the formation of the trusts. JA 1119.

Ample evidence supports this finding. The Richardsons maintained exclusive control over the trusts' assets; they were the trusts' sole beneficiaries; and the trusts lacked independent trustees. Most notably, the Richardsons' use of the trusts' assets was no more constrained after the creation of the trusts than it was before their formation: They lived in the same home; they had similar expenses; and Homer had the same job (a self-employed salesperson).

So far as the record shows, the business trust also had no "valid, non-tax business purpose." *Estate of Kluener*, 154 F.3d at 634. All that changed after the formation of the trust was the Richardsons' tax obligation, which by itself does not suffice to establish a legitimate business purpose for the trust. The Richardsons, the record shows, used the trust as nothing more than a "conduit through which to pass title," *Court Holding Co.*, 324 U.S. at 334, and experienced "no real change in the[ir] economic relation . . . to the income in question," *Tower*, 327 U.S. at 291, even after the trust ostensibly owned all of their assets and their right to earn income.

Making matters worse, the Internal Revenue Code expressly bars the types of deductions the business trust purported to authorize. "[N]o deduction," the Code says, "shall be allowed for

personal, living, or family expenses." 26 U.S.C. § 262(a). The nondeductibility of personal expenses remains "fundamental to our income tax regime," *Muhich v. Comm'r*, 238 F.3d 860, 863 (7th Cir. 2001), prompting courts to be skeptical of efforts to transform a "famil[y's] expenses into expenses of trust administration," *id.* at 864; *see also Harris v. Comm'r*, 41 T.C.M. (CCH) 815, 815 (1981) ("To anyone . . . not incorrigibly addicted to the 'free lunch' philosophy of life, the entire [family trust] scheme had to have been seen as a wholly transparent sham.").

No less inappropriate was the Richardsons' use of the charitable trust to deduct the remainder of their income. Because the Richardsons alone "control[led] the donee" trust, they undertook a "heavy burden of proving the facts that would entitle them to a charitable deduction." *See Smith v. Comm'r*, 800 F.2d 930, 934 (9th Cir. 1986). To be "charitable," a contribution must be to an organization "operated *exclusively* for religious, charitable, scientific, literary, or educational purposes" and may not "inure[] to the benefit of any private shareholder" of the recipient organization. 26 U.S.C. § 170(c)(2)(B), (C) (emphasis added); *see also Comm'r v. John Danz Charitable Trust*, 284 F.2d 726, 731 (9th Cir. 1960) (noting that to be tax exempt a trust must be "organized exclusively for charitable purposes"). "[I]n searching for the intentions or motives behind the structure of a charitable entity, a court may look beyond the four corners of the creating instrument and may consider extrinsic evidence on this subject where it is helpful." *Id.* at 733.

Considerable evidence shows that the Richardsons "operated" the trusts for less than charitable purposes and intended the trust funds to "inure" to their own benefit in the end. In his own words, Homer told potential clients in his promotion materials that they "had to pay out . . . five percent each year to a charity" from the charitable trust, but other than those payments "you essentially would become your own charity," and the charitable trust would become "retirement income." JA 971. Establishing retirement income for one's self, needless to say, is hardly a selfless and charitable act. The Richardsons nonetheless claim that the trust was a legitimate charitable entity, relying on the trust instrument, which ostensibly required all trust disbursements to be charitable, and on several donations to various charities between 1998 and 2002. But the Richardsons never sought § 501(c)(3) tax-exempt status for the trust, and the sum of charitable donations given over *four* years (approximately $54,000) represented only a small percentage of the "charitable" deductions the Richardsons claimed for the *two* relevant years—1996 and 1997 ($311,179). The relatively modest amounts of these donations—plus the fact that the Richardsons made many of them *after* the IRS investigation started—undermine rather than legitimize their intentions. We agree with the district court that the evidence shows that the couple intended to use the trust corpus as retirement savings and designed the modest disbursements to give the trust the veneer, but not the reality, of legitimacy. Just as the initial disbursements made by a typical Ponzi scheme do not make the investment scheme real, *see Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1350 n.2 (11th Cir. 2003), so too the Richardsons' charitable disbursements cannot hide their less-than-charitable purposes nor keep the entire transaction from being disregarded as a sham.

That the trusts were valid under Ohio law, does not make them legitimate for federal income tax purposes. By adhering to state law in forming a trust, an individual does not necessarily give it economic substance as a matter of federal law. Just as the world can see through a Potemkin village, so the Tax Code sees through sham entities in assessing taxes, even though the trusts are otherwise "valid under state laws." *Tower*, 327 U.S. at 291; *see also Zmuda v. Comm'r*, 79 T.C. 714, 720 (1980) ("[W]e will look through that form . . . regardless of whether the entity has a separate existence recognized under State law . . . ."). For the same reason that a valid registration of a name of incorporation under state law does not innoculate it from challenge under the federal trademark laws, the same is true with respect to state trusts and federal income tax liability.

The Tenth Amendment does not give the Richardsons any refuge either. The Amendment, it is true, reserves "[t]he powers not delegated to the United States by the Constitution . . . to the States." U.S. Const. amend. X. But after the ratification of the Sixteenth Amendment in 1913, what

more is there to delegate?  The amendment broadly delegates to Congress the "power to lay and collect taxes on incomes, from whatever source derived." *Id.* amend. XVI.  And, it is assuredly "necessary and  proper," *id.* art. I, § 8, cl. 18, to the administration of that authority to impose income taxes on transactions according to their substance, not to what state law says about them, *cf. Court Holding Co.*, 324 U.S. at 334 ("To permit the true nature of a transaction to be disguised by mere formalisms . . . would seriously impair the effective administration of the tax policies of Congress.").

The Richardsons also have waived any argument that the Commissioner incorrectly calculated their deficiencies.  They provided the Tax Court with "no documentary evidence whatsoever that would support or corroborate an alternative computation," JA 1127, and did not challenge the computations in their Tax Court petition or in their post-trial briefs, *see Estate of Quirk v. Comm'r*, 928 F.2d 751, 758 (6th Cir. 1991) ("[W]e should not be considered a 'second shot' forum . . . where secondary, back-up theories may be mounted for the first time.").

B.

The Richardsons next challenge the Tax Court's imposition of fraud penalties upon Homer and the lifting of the statute of limitations for their deficiencies.  The Internal Revenue Code provides that "there shall be added to the tax an amount equal to 75 percent of the portion of [any] underpayment [of tax required] which is attributable to fraud," 26 U.S.C. § 6663(a), and that a deficiency from a "false or fraudulent return with the intent to evade tax . . . may be assessed . . . at any time," *id.* § 6501(c)(1).  The Commissioner bears the burden of proving fraudulent intent by clear and convincing evidence.  *Conti v. Comm'r*, 39 F.3d 658, 664 (6th Cir. 1994).

It is the rare taxpayer who announces to the world his intent to defraud the Federal Government.  In finding tax fraud, courts thus rely as they must upon circumstantial evidence, *United States v. Walton*, 909 F.2d 915, 926 (6th Cir. 1990), inferring the requisite intent from "any conduct, the likely effect of which would be to mislead or to conceal," *Spies v. United States*, 317 U.S. 492, 499 (1943).  We have identified several "badges" of fraud in this setting, including a taxpayer's failure to report income, "failure to furnish the Government with access to . . . records," "failure to keep adequate books and records" and "concealment of bank accounts from Internal Revenue agents." *Solomon v. Comm'r*, 732 F.2d 1459, 1461–62 (6th Cir. 1984).  And we have found fraud in a wide range of circumstances, including where individuals conceal their income by dealing in cash, *see Conti*, 39 F.3d at 665, where they "fail[] to report income," *Solomon*, 732 F.2d at 1461, and where people with business experience give "implausible explanations of conduct," *Walton*, 909 F.2d at 926.  Although we consider Homer's intent at the time of filing, *see* 26 U.S.C. § 6663(a), we may consider his actions after the tax filings to ascertain his earlier state of mind, *see Solomon*, 732 F.2d at 1462 (considering the taxpayer's lack of compliance with the IRS investigation as evidence of fraud and distinguishing cases where "the taxpayer had cooperated fully"); *see also United States v. Upton*, 799 F.2d 432, 433 (8th Cir. 1986) ("Evidence of [a taxpayer's] questionable compliance with tax laws, both in the years prior to and subsequent to [the relevant filing,] is probative of willfulness in the present context.").

The Tax Court affirmed the fraud penalties for six substantive reasons: The implementation of the trust structure itself was "an affirmative indicium of fraud," JA 1138; the Richardsons either "failed to keep" or "elected to conceal" proper financial records, JA 1137;  Homer was "not unsophisticated," JA 1135; he "fail[ed] to cooperate with tax authorities," JA 1139; he "fail[ed] to heed warnings with respect to the improper nature of the Aegis trust structure," JA 1140; and he "was an active promoter" in the Aegis trust scheme where "tax reduction was emphasized above all other advantages," JA 1136 (emphasis omitted).  At the same time, it also determined that Homer's "demeanor at trial and disingenuous attempts to distance himself from the Aegis organization . . . were singularly unconvincing." *Id.*  The record supports the Tax Court's finding.

The Richardsons built their trusts on two premises: Taxpayers may take deductions for personal expenses, and they may take deductions for payments to a "charitable" trust, the bulk of which ultimately would serve as *their* retirement savings. Because the "likely effect of" a scheme designed to further such improper goals "would be to mislead or to conceal," *Spies*, 317 U.S. at 499, the creation of the trusts suggests fraudulent intent. Also suggesting fraudulent intent is that Homer did not just participate in his own trusts but actively promoted them to others, minimizing the possibility that he did not know how they worked or what effect on income reporting they would have.

Homer's behavior after the IRS inquired about the trusts made a bad situation worse. Instead of complying with the agents' requests, Homer questioned their authority to inspect the trust documents, failed to attend meetings with IRS agents, threatened his banks with lawsuits if they disclosed his financial information, filed motions to quash third-party summonses issued by the government and threatened to sue an IRS agent. When the IRS began investigating Aegis customers, Homer went into "tax protesting mode," JA 982, creating two LLCs, which he promoted as a way to "take . . . future trust returns 'off the radar screen' for audit," JA 1187. As late as 2002, the Richardsons continued to obstruct the IRS investigation by challenging the agents' authority rather than furnishing the agents with requested documents.

Nor does the record contain any evidence that Homer relied on independent legal advice in treating the trusts as bona fide. To the contrary, he failed to heed several warnings that the trusts rested on thin ice, if indeed they rested on any ice at all. In 1997, the IRS issued Notice 97–24, which gave a detailed account of "abusive trusts" that in relevant detail well described the Aegis trust system. *See* 1997-16 I.R.B. at 6–7 (describing abusive trusts as those that create "deductions for personal expenses paid by the trust," "reduce[] or eliminate[] the owner's self-employment taxes" and create deductions for trusts with "purported" charitable purposes that are in reality "principally for the [benefit] of the owner"). Homer nonetheless continued to use the trusts, saying that "the Aegis business trust is [not] the kind of trust that is addressed," JA 335az, but offering no explanation why. After the IRS issued Notice 97–24, Missy Vaselaney, an independent attorney, told him that the trusts were illegitimate. He ignored her because she "was not a tax expert as far as trusts were concerned," JA 903, though he never explained why he never talked to an independent "tax expert as far as trusts were concerned." Even after the IRS had begun investigating him, Homer refused to take anything but an uninformed, self-interested and stubborn look at the validity of the trusts.

Disclaiming any intent to defraud the government, Homer repeats the refrain that the business trusts were legitimate under Ohio law. But the legitimacy of a trust under state law does not prohibit a taxpayer from fraudulently misusing an otherwise-legitimate trust to hide income from the IRS.

No more persuasive is Homer's reliance on a legal analysis provided by Aegis, the creator of the trusts. Doubtless, ignorance is an adequate defense to fraud. But Homer's active promotion of the trusts, his intimate familiarity with how they worked and his utter disregard of serial warning signs of their illegality take the teeth out of any claim that others duped him into forming, to say nothing of exploiting, the trusts. As the Tax Court correctly concluded, Homer's attempt to blame Aegis associates for his actions is "singularly unconvincing." JA 1136.

Homer's residual argument—that he could not have intended to defraud the government because all of his income was reported to the IRS in some form—also falls short. The fraud penalty does not have to be based upon any understatement of gross income, as Homer seems to believe. It is assessed upon the fraudulent "underpayment of *tax* required." 26 U.S.C. § 6663(a) (emphasis added). Because the Tax Court did not clearly err when it found the whole scheme fraudulent, it

makes no difference that the Richardsons may have reported all of their gross receipts on one form or another.

The evidence of Homer's obstruction and blatant disregard for the illegality of the trust scheme, coupled with the Tax Court's finding that his explanations were disingenuous, amply supports the fraud ruling under a clear error standard of review. The penalties in this case were justified, and Homer's fraud relieves the Commissioner of the normal time bar on deficiency assessments. Homer almost certainly would have saved himself considerable heartache had he complied with the IRS, but for reasons that to this day remain unclear he chose not to, and accordingly the Commissioner acted within his authority in imposing the fraud penalties.

C.

Gloria Richardson also has not shown that she deserves the protection of an innocent spouse. Because the Richardsons filed joint tax returns for 1996 and 1997, they are jointly and severally liable for any deficiencies. *See* 26 U.S.C. § 6013(d)(3). Although Gloria is not liable for Homer's fraud penalties, Homer's fraud lifts the statute of limitations for the "false or fraudulent *return*." *Id.* § 6501(c)(1) (emphasis added); *see also Ballard v. Comm'r*, 740 F.2d 659, 663 (8th Cir. 1984) ("[S]ection 6501(c)(1) lifts the statute of limitations on tax assessments against both spouses when they file jointly and one has defrauded the government in the process.").

The Tax Code provides a waiver of liability for an innocent spouse where the spouse proves that she "did not know, and had no reason to know, that there was such understatement" and "taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency." 26 U.S.C. § 6015(b)(1)(C), (D). The innocent spouse must prove more than a lack of "knowledge of the tax consequences" of a transaction; she must meet the more stringent burden of proving she had no "knowledge of the transaction itself." *Purcell v. Comm'r*, 826 F.2d 470, 474 (6th Cir. 1987).

Gloria cannot carry this burden. Although she claims to have played only a negligible role in the trust administration, the record is clear that she knew of the transactions. For example: she was the Executive Secretary of both trusts, signed all of the trust documents, signed the Richardsons' personal tax returns, had signatory authority over all of the bank accounts and attended all of the trust board meetings. According to the charitable trust's tax returns, Gloria also spent two hours a week fulfilling her duties to the trust. Homer's testimony at trial that Gloria was unable to work because she was undergoing chemotherapy during some of this time period does not suffice to overcome this clear evidence and the suggestion that goes with it—that Gloria was an active participant in the trust scheme.

Even had Gloria not known about the transactions (which is not the case), she has failed to show that it would be "inequitable to hold [her] liable for the deficiency." 26 U.S.C. § 6015(b)(1)(D). As the record confirms, both Richardsons benefitted from their improved financial situation and would have benefitted substantially in the future if the taxes had remained unpaid. Under these circumstances, there is nothing inequitable about holding Gloria liable for a tax that she and Homer should have paid together in the first instance.

\* \* \* \* \*

While it may be that "nothing can be said to be certain, except death and taxes," Letter from Benjamin Franklin to Jean Baptiste Le Roy (Nov. 13, 1789), *reprinted in* 10 The Writings of Benjamin Franklin 69 (Albert Henry Smyth ed., 1907), it would also seem to be certain that most men and women will put both of them off for as long as they can. There is nothing wrong with that. When it comes to taxes, Learned Hand was right: "Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury;

there is not even a patriotic duty to increase one's taxes." *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934). But there are legitimate and illegitimate means for making one's taxes "as low as possible," and the federal government's tax-collection efforts would come to a halt if the Commissioner and the courts could not ensure the substance of trusts and other tax-minimization transactions. Just as Judge Hand properly concluded that the underlying transaction in *Gregory* was a "sham" for tax purposes, *id.* at 811 ("To dodge the shareholders' taxes is not one of the transactions contemplated as corporate 'reorganizations.'"), so it is here.

## III.

For these reasons, we affirm.