T.C. Memo. 2019-85

UNITED STATES TAX COURT

SHAHRAM KOHAN AND YONINA KOHAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18830-17.                              Filed July 9, 2019.

Richard S. Kestenbaum, for petitioners.

James P.A. Caligure and Monica E. Koch, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  The Internal Revenue Service (IRS or respondent) deter-
mined deficiencies in Federal income tax and penalties for petitioners' 2008 and
2009 tax years.  For petitioner husband, the IRS determined deficiencies, fraud

[*2] penalties under section 6663, and alternative accuracy-related penalties under section 6662(a) as follows:[1]

|       |            | Penalties |            |
| Year  | Deficiency | Sec. 6663 | Sec. 6662(a) |
|-------|------------|-----------|------------|
| 2008  | $114,184   | $85,638   | $22,837    |
| 2009  | 119,705    | 89,665    | 23,941     |

The IRS issued a separate notice of deficiency to petitioner wife, determining the same deficiencies but only accuracy-related penalties. Petitioners have conceded the deficiencies, so the question we must decide is whether petitioner husband, for each year at issue, is liable for fraud.

Petitioners contend that assessment of the amounts shown above is barred by the three-year period of limitations in section 6501(a). Because we find that the underpayments were due to fraud, there is no period of limitations, and the tax for 2008 and 2009 "may be assessed * * * at any time." Sec. 6501(c)(1). We will accordingly sustain the deficiencies and fraud penalties determined by respondent.

---

[1]All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

**[*3]**                          FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulations of facts and the attached exhibits are incorporated by this reference.  Petitioners resided in New York when they filed their petition.

A.    The Dental Practice

Petitioner husband (Dr. Kohan) was born in Iran and immigrated to the United States.  He attended Yeshiva University in New York and dental school at New York University.  After dental school he joined the practice of another dentist, Dr. Magid, in Flushing, New York.

Two years later, in 2001, Dr. Kohan acquired Dr. Magid's practice as well as the building in which the practice was conducted.  Although Dr. Kohan's brother was listed as the purchaser on the title certificate for the property, his brother appears to have acted as a nominee.  Dr. Kohan paid no rent to his brother, made all mortgage payments on the dental office building, and defrayed the expenses of maintaining it.

The dental office building included a residential portion that was occupied by one or more tenants.  At no time after 2001 did Dr. Kohan or his brother report rental income from these tenants.  Dr. Kohan testified that he allowed the tenants

[*4] to live in the building rent free because they were "taking care of the property and watching it." We did not find this testimony credible.

From 2001 to the present Dr. Kohan conducted his dental practice from this building as a sole practitioner. During the tax years at issue he worked between 40 and 50 hours a week (excluding Friday afternoons, Saturdays, and Jewish holidays), seeing between 40 and 50 patients each day. He had two full-time employees--a dental assistant and an office manager--and several part-time staff. The office manager, Tamayra Rodriguez, handled the mail, maintained patient records, collected payments, and recorded those payments on patients' charts. She had no training as an accountant or tax professional.

Dr. Kohan accepted payment from patients by cash, check, and credit card. He did not maintain a separate business account for the dental practice, so all deposits were made into his personal bank account. Cash payments were typically placed in a box in Dr. Kohan's office. He would occasionally use this cash to pay for his employees' lunches or give them cash bonuses. He took the rest of the cash home with him.

Payments by check were manually deposited into Dr. Kohan's bank account. Ms. Rodriguez typically applied a stamp endorsement on the back of the

[*5] checks and filled out deposit slips. Either she or Dr. Kohan went to his bank to deposit the checks.

Dr. Kohan received from his patients a large volume of credit card payments, which were electronically deposited into his bank account. For 2008 he received 188 distinct credit card payments totaling $98,639. For 2009 he received 212 distinct credit card payments totaling $122,968.

Many of Dr. Kohan's patients had dental insurance, and in those instances he would charge the patients the appropriate copayments at the time of service, then receive additional payments from the insurance company. Major insurance companies issued these checks twice monthly. When the insurance checks arrived in the mail, Ms. Rodriguez would record the payments on the patients' charts and set the checks aside to be deposited along with other checks. Unlike payments that patients remitted by cash, check, or credit card, payments remitted by the insurance companies were reported by them to the IRS on Forms 1099-MISC, Miscellaneous Income. Dr. Kohan was aware of this distinction.

B. Tax Return Preparation

Ms. Rodriguez did not prepare Dr. Kohan's income tax returns. On the recommendation of another dentist, Dr. Kohan hired Bess Fan, a certified public accountant, to prepare his personal tax returns and the payroll tax returns for his

[*6] dental practice. Ms. Fan prepared these returns using worksheets that Dr. Kohan provided to her.

Ms. Rodriguez placed all Forms 1099-MISC that the office received from insurance companies into a folder, which Dr. Kohan supplied to Ms. Fan at tax time. Ms. Rodriguez also prepared expense summaries for the dental practice by going through Dr. Kohan's checkbook and making a list of what she believed to be business expenses. Dr. Kohan supplied these expense summaries to Ms. Fan.

Dr. Kohan told Ms. Fan that his dental practice derived most of its income from insurance company payments. He supplied her with a list of all such payments, together with the folder containing the Forms 1099-MISC. For 2009 Dr. Kohan personally tallied up the insurance company payments on an adding machine and provided the register tape to Ms. Fan.

After reviewing the income worksheets Ms. Fan noted the absence of any copayments. She asked Dr. Kohan to supply the dollar amounts of copayments he had received from patients. Having kept no records of copayments, Dr. Kohan made an estimate for each year. He informed Ms. Fan that he had received copayments of $20,000 for 2008 and $31,043 for 2009. He did not disclose to her any of the other payments he had received from patients who paid by cash, check, or credit card.

[*7]  Dr. Kohan likewise failed to disclose to Ms. Fan, for purposes of preparing payroll tax returns, the actual amounts of wages he had paid his staff.  For 2009 Ms. Fan prepared, using the information Dr. Kohan had supplied to her, Form W-3, Transmittal of Wage and Tax Statements.  This form and the accompanying Forms W-2, Wage and Tax Statement, reported that the dental practice for 2009 had paid total wages of $21,573, consisting of $10,179 to Ms. Rodriguez and $11,394 to Perla Vargas, a dental assistant.  Those two individuals during 2009 actually received wages of $28,544 and $27,931, respectively.  Dr. Kohan also employed during 2009 at least three other individuals, who worked part-time at the front desk or as dental assistants.  The payroll tax returns reported no wages paid to any of these staff members.

Ms. Fan prepared petitioners' personal income tax returns using the information Dr. Kohan provided to her about their income and expenses.  She did not independently verify the expenses shown on Ms. Rodriguez' expense worksheets.  Dr. Kohan did not supply Ms. Fan, before she prepared petitioners' 2008 and 2009 returns, any bank records that would enable her to confirm the gross receipts of the dental practice.

On Schedule C, Profit or Loss From Business, for 2008, petitioners reported gross profit of $345,652 from the dental practice, representing gross receipts of

[*8] $375,669 less cost of goods sold of $30,017. The gross receipts consisted of the insurance company payments reported on Forms 1099-MISC, plus $20,000 of patient copayments as estimated by Dr. Kohan. Petitioners reported total business expenses of $292,485, including "other" expenses of $141,999, leaving net income of $53,167 from the dental practice. After claiming itemized deductions and personal exemptions for themselves and their children, petitioners reported taxable income of zero for 2008.

On their Schedule C for 2009, petitioners reported gross profit of $438,056 from the dental practice, representing gross receipts of $464,738 less cost of goods sold of $26,682. The gross receipts consisted of the insurance company payments reported on Forms 1099-MISC, plus $31,043 of patient copayments as estimated by Dr. Kohan. Petitioners reported total business expenses of $346,967, including "other" expenses of $166,742, producing net income of $91,089 from the dental practice. After claiming itemized deductions and personal exemptions for them-selves and their children, petitioners reported taxable income of $742 for 2009.

Petitioners gave large sums to religious organizations during 2008 and 2009, some of which they claimed as charitable contribution deductions on their tax returns. For 2008 they transferred $63,112 to religious organizations; of this sum, $17,602 was paid to an organization operated by Dr. Kohan's brother. For

[*9] 2009 they transferred $92,093 to religious organizations; of this sum, $28,608 was paid to the organization operated by Dr. Kohan's brother.

C.    IRS Examination

The IRS selected petitioners' 2008 and 2009 returns for examination. Dr. Kohan was uncooperative during the audit process, both in supplying documents and in answering questions.

The revenue agent (RA) assigned to conduct the examination made several requests for business records of the dental practice. After being notified that petitioners' returns were being examined, Ms. Fan used their bank statements to create a general ledger of their income and expenses. The RA interviewed Ms. Fan and relied on her general ledger to perform a bank deposits analysis.

The RA interviewed Dr. Kohan and asked him a number of questions about items on petitioners' returns. He declined to answer these questions, insisting that the RA direct all questions to Ms. Fan. The RA explained that she had already interviewed Ms. Fan, who was unable to answer the questions. Dr. Kohan still refused to cooperate. Dr. Kohan falsely told the RA that he was renting the dental office building from a relative, but refused to identify that relative or state how much rent he was paying.

**[*10]** The RA also interviewed Ms. Rodriguez. She informed the RA that a receipts book was kept in the basement of the dental office building and that all payments received by the practice, including payments made by cash, check, and credit card, were recorded in patients' files. Dr. Kohan withheld this information and these documents from the RA and from Ms. Fan.

The RA's analysis of petitioners' bank deposits and Ms. Fan's general ledger revealed that petitioners had understated the gross receipts of Dr. Kohan's dental practice by $295,276 and $244,787 for 2008 and 2009, respectively. These understatements were attributable to petitioners' failure to report any of the payments that patients made by cash, check, or credit card, apart from copayments of $20,000 and $31,043 that Dr. Kohan had estimated for 2008 and 2009.

The RA also made significant adjustments to the expenses reported on Dr. Kohan's Schedules C. The largest adjustments were to the "other expenses" of the dental practice, which petitioners had reported as $141,999 for 2008 and $166,742 for 2009. The RA found more than half of these deductions to be unsubstantiated, resulting in disallowances of $99,420 and $94,914, respectively. The RA made a number of other adjustments, a few of which were favorable to petitioners (e.g., a $33,243 upward adjustment to cost of goods sold for 2008). All in all, the RA de-

**[\*11]** termined that petitioners had understated their taxable income by $366,185 for 2008 and by $380,124 for 2009.

D.     Tax Court Proceedings

On June 8, 2017, the IRS issued notices of deficiency to petitioners, determining the deficiencies and penalties set forth above. See supra p. 2. Petitioners timely petitioned for redetermination of the deficiencies and penalties, initially proceeding pro se. When petitioners did not respond to informal discovery requests, respondent served formal discovery. When petitioners ignored respondent's formal discovery requests, respondent filed, on March 21, 2018, motions to compel responses to interrogatories and to compel production of documents. We granted those motions and directed petitioners to produce the requested information by April 23, 2018, which they failed to do.[2]

At trial Dr. Kohan did not dispute that he substantially underreported the income of his dental practice. He testified that the underreporting was not his fault,

---

[2]On May 10, 2018, one week before this case was initially scheduled to be tried, counsel entered an appearance for petitioners and thereafter cooperated fully with respondent's counsel in preparing the case for trial. On September 26, 2018, counsel for petitioners moved that we relieve them of certain deemed admissions, urging that they did not understand the consequences of not timely responding to respondent's request for admissions served upon them in February 2018. See Rule 90(c), (f). We took that motion under advisement and will grant it, finding no prejudice to respondent because the matters covered by his requests for admissions were amply addressed by testimony at trial.

[*12] urging that he does not know much about business, that he kept very poor records, and that he relied on Ms. Rodriguez to keep his books and on Ms. Fan to prepare proper tax returns. He testified that he did not review weekly or monthly bank deposits for the dental practice and had no idea how much money he was making.

We did not find Dr. Kohan's testimony credible. Although he testified that his financial circumstances were tight during 2008 and 2009, he spent money quite liberally. He and his family made annual trips to Florida and Israel. He paid the mortgage on his mother's house during 2008 and 2009, resulting in annual expenditures of $61,313 and $65,363, respectively. He transferred large sums to religious organizations during 2008 and 2009, resulting in annual expenditures of $63,112 and $92,093, respectively. Of those sums, more than $46,000 was transferred to an organization operated by his brother, who held title to the dental office building.

The testimony at trial showed that Dr. Kohan took deliberate steps to conceal assets and income. Although his brother held title to the dental office building during 2008 and 2009, Dr. Kohan paid his brother no rent. Rather, Dr. Kohan made all mortgage payments and defrayed all maintenance expenses on that property, indicating that he was the owner in substance and that his brother was a

[*13] mere nominee. In 2015, during the IRS investigation of Dr. Kohan, his brother divested himself of legal title to the dental office building by transferring it for no consideration to what appears to have been a shell corporation.

The RA's bank deposits analysis showed that Dr. Kohan frequently wrote large checks to himself on his bank account, held those checks for a few days, and then used a check-cashing service to convert the checks to cash. Ms. Fan testified as to her understanding that Dr. Kohan's purpose in doing this was to artificially reduce the bank account balance that would be visible to his creditors. Dr. Kohan testified that he did this in response to the 2008 financial crisis, withdrawing cash with the intent to redeposit the checks once the banking system returned to normal. We did not find his testimony credible.

OPINION

A.  Limitations Period on Assessment

Section 6501(a) generally requires the IRS to assess a tax within three years after the filing of a return. The period of limitations is extended to six years where the taxpayer omits from gross income an amount "in excess of 25 percent of the amount of gross income stated in the return." Sec. 6501(e)(1)(A)(i). The notices of deficiency in this case were issued more than seven years after the period of

**[*14]** limitations began to run.  Respondent concedes that assessment of the deficiencies would be time barred under the general rules of section 6501(a) and (e).

Section 6501(c)(1) provides, however, that where a taxpayer has filed "a false or fraudulent return with the intent to evade tax," there is no period of limitations, and the tax "may be assessed * * * at any time."  In the case of a joint return, fraud by either taxpayer suspends indefinitely the period of limitations for both taxpayers.  See Richardson v. Commissioner, T.C. Memo. 2006-69, 91 T.C.M. (CCH) 981, 996 ("[W]here a joint return is filed, fraud by one spouse will serve to lift the statute of limitations as to, and permit assessment against, both spouses."), aff'd, 509 F.3d 736 (6th Cir. 2007); see also Ballard v. Commissioner, 740 F.2d 659, 663 (8th Cir. 1984), aff'g in part, rev'g in part T.C. Memo. 1982-446.

"[T]he determination of fraud for purposes of the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663."  Neely v. Commissioner, 116 T.C. 79, 85 (2001).  Whether the underpayments at issue were due to fraud thus deter-

**[\*15]** mines both whether Dr. Kohan is liable for the civil fraud penalty and whether respondent can assess the deficiencies that petitioners have conceded.[3]

B.    Civil Fraud Penalty

"If any part of any underpayment of tax required to be shown on a return is due to fraud," section 6663(a) imposes a penalty of 75% of the portion of the underpayment due to fraud.  Respondent has the burden of proving fraud, and he must prove it by clear and convincing evidence.  Sec. 7454(a); Rule 142(b); Richardson, 509 F.3d at 743.  To sustain his burden, respondent must establish two elements:  (1) that there was an underpayment of tax for each year at issue and (2) that at least some portion of the underpayment for each year was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983).

Where the Commissioner determines fraud penalties for multiple tax years, his burden of proving fraud "applies separately for each of the years."  Vanover v. Commissioner, T.C. Memo. 2012-79, 103 T.C.M. (CCH) 1418, 1420 (quoting

_____

[3]Petitioners do not challenge respondent's satisfaction of section 6751(b)(1), which provides that "[n]o penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."  In any event, the RA's supervisor approved assertion of the fraud penalties on May 26, 2017, before the IRS issued the notice of deficiency to Dr. Kohan.  That notice constituted the first formal communication to Dr. Kohan of the IRS' determination to assert the fraud penalty against him.  See Clay v. Commissioner, 152 T.C. __, __ (slip op. at 42-44) (Apr. 24, 2019).

[*16] <u>Temple v. Commissioner</u>, T.C. Memo. 2000-337, <u>aff'd</u>, 62 F. App'x 605 (6th Cir. 2003)). If respondent proves that some portion of an underpayment for a particular year was attributable to fraud, then "the entire underpayment shall be treated as attributable to fraud" unless the taxpayer shows, by a preponderance of the evidence, that the balance of the underpayment was not so attributable. Sec. 6663(b).

Petitioners have conceded that they underpaid their Federal income tax by $114,184 in 2008 and $119,703 in 2009. They have thus conceded the first element of the fraud penalty. We thus turn to the second element of the penalty, fraudulent intent.

Fraud is intentional wrongdoing designed to evade tax believed to be owing. <u>Neely</u>, 116 T.C. at 86. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. <u>Estate of Pittard v. Commissioner</u>, 69 T.C. 391, 400 (1977). Fraud is not to be presumed or based upon mere suspicion. <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 699-700 (1989). But because direct proof of a taxpayer's intent is rarely available, fraudulent intent may be established by circumstantial evidence. <u>Grossman v. Commissioner</u>, 182 F.3d 275, 277-278 (4th Cir. 1999), <u>aff'g</u> T.C. Memo. 1996-452. Respondent satisfies his burden of proof by showing that "the taxpayer intended to evade taxes known to be owing by

**[*17]** conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." Parks v. Commissioner, 94 T.C. 654, 661 (1990). The taxpayer's entire course of conduct may be examined to establish the requisite intent, and an intent to mislead may be inferred from a pattern of conduct. Webb v. Commissioner, 394 F.2d 366, 379 (5th Cir. 1968), aff'g T.C. Memo. 1966-81; Stone v. Commissioner, 56 T.C. 213, 224 (1971).

Circumstances that may indicate fraudulent intent, often referred to as "badges of fraud," include but are not limited to: (1) understating income, (2) keeping inadequate records, (3) giving implausible or inconsistent explanations of behavior, (4) concealing income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) supplying incomplete or misleading information to a tax return preparer, (8) providing testimony that lacks credibility, (9) filing false documents (including false tax returns), (10) failing to file tax returns, and (11) dealing in cash. See Schiff v. United States, 919 F.2d 830, 833 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Parks, 94 T.C. at 664-665; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988); Morse v. Commissioner, T.C. Memo. 2003-332, 86 T.C.M. (CCH) 673, 675, aff'd, 419 F.3d 829 (8th Cir. 2005). No single factor is disposi-

[*18] tive, but the existence of several factors "is persuasive circumstantial evidence of fraud." Vanover, 103 T.C.M. (CCH) at 1420-1421.

Several of these factors are neutral or inapposite here. Dr. Kohan did not engage in illegal activities, and (although his patients often paid in cash) he did not himself deal extensively in cash. Nor did he altogether fail to file tax returns. But after thorough review of the record, we conclude that the other eight badges of fraud overwhelmingly demonstrate that Dr. Kohan acted with fraudulent intent for both tax years at issue.

1.  Understating Income

A pattern of substantially understating income for multiple years is strong evidence of fraud, particularly if the understatements are not satisfactorily explained. Id., 103 T.C.M. (CCH) at 1421. Petitioners understated the income from Dr. Kohan's dental practice by $366,185 for 2008 and $380,124 for 2009. Petitioners had little other income during 2008 and 2009, and these understatements are large both in absolute and in relative terms.

These understatements were chiefly attributable to Dr. Kohan's underreporting the gross receipts of his dental practice. He underreported his Schedule C gross receipts by $295,276 for 2008 and by $244,787 for 2009. All of these receipts were deposited into his personal bank account, so he cannot plausibly claim

[*19] ignorance of their magnitude. See Clayton v. Commissioner, 102 T.C. 632, 647 (1994) (finding fraud where there was a "steady flow" of unreported payments into the taxpayer's personal bank account).

For 2008 and 2009 Dr. Kohan reported net income from his dental practice of only $53,167 and $91,089, respectively. But during these years he made mortgage payments on his mother's house of $61,313 and $65,363, respectively, and payments to religious organizations of $63,112 and $92,093, respectively. Putting aside all of his family's living expenses, these payments alone dwarf the net income he reported from his dental practice, which was his only meaningful source of income. Given these facts, we find Dr. Kohan's testimony that he "had no idea how much money he was making" to be wholly incredible.

Dr. Kohan's explanation for his underreporting of gross income was his supposed ineptitude at business and his reliance on Ms. Rodriguez and Ms. Fan. We find this explanation inconsistent with the objective facts. The income Dr. Kohan reported to Ms. Fan was not random or haphazard. The only stream of income he initially reported to her consisted of the payments he received from insurance companies. He knew that these were the only payments that would be reported to the IRS on Forms 1099-MISC. We do not think it a coincidence that these are the only receipts that he reported to Ms. Fan.

[*20] Prompted by Ms. Fan's insistence that he must have received copayments from his insured patients, Dr. Kohan supplied estimates of those copayments, which were unsupported by his business records. He deliberately concealed from her all other payments that his patients made by cash, check, or credit card. These facts provide very strong evidence of fraudulent intent.

2. Maintaining Inadequate Records

Fraudulent intent can be inferred from a failure to maintain adequate books and records. See Ark. Oil & Gas, Inc. v. Commissioner, T.C. Memo. 1994-497, 68 T.C.M. (CCH) 887, 891. Dr. Kohan admitted that his recordkeeping practices were poor. He did not keep a general ledger for his dental practice (though Ms. Fan created one during the IRS audit), and he kept no receipts for cash expenditures. He failed to keep separate bank accounts for his business and his personal affairs, so his personal and business expenses were commingled and difficult to separate. He delegated to his office manager the task of combing through his checkbook in an effort to identify business expenses. This is not a reliable method of tracking expenses for a business.

Dr. Kohan's actual gross receipts were recorded in his patients' charts, on which Ms. Rodriguez recorded all payments from patients and their insurers. Payments were also tracked in a receipt book kept in the basement of the dental office

[*21] building.  But despite multiple requests for his business records, Dr. Kohan declined to provide any of these documents to the RA.

Dr. Kohan sought to attribute the inadequacy of his business records to the asserted lack of a computer in his dental office.  We did not find his testimony on this point credible.  On his Schedules C for 2008 and 2009, Dr. Kohan claimed aggregate deductions of $19,658 for computer software and related expenses.  As the office manager, Ms. Rodriguez obviously knew whether the office had a computer.  We find it inconceivable, on the basis of her testimony, that she would have reported computer-related expenses to Ms. Fan if the office had no computer.  Overall, this second badge of fraud favors respondent.

3.    Giving Implausible or Inconsistent Explanations of Behavior

Dr. Kohan is a highly educated individual, but he offered to the IRS and the Court a variety of implausible and inconsistent explanations about his income and assets.  He told the RA that a relative owned the dental office building and leased it to him, but he refused to identify that relative or specify the amount of rent paid.  The RA's investigation revealed that Dr. Kohan's brother was listed as the owner on the title certificate, but Dr. Kohan paid his brother no rent (unless his purported contributions to his brother's religious organization constituted disguised rent).  Dr. Kohan's making all mortgage payments on the building and defraying all

[*22] maintenance expenses were inconsistent with his testimony that his brother owned the property.

One or more tenants occupied the residential portion of the dental office building during 2008 and 2009, but neither Dr. Kohan nor his brother reported any rental income. Dr. Kohan testified that the tenants were allowed to live rent free during 2008 and 2009 (and during the previous seven years) because they "were taking care of the property and watching it." We found this testimony wholly implausible.

Dr. Kohan also provided inconsistent explanations about his practice of writing large checks to himself on his personal bank account. He told Ms. Fan that he did this in order to reduce the account balance that would be visible to creditors. If true, that itself would be indicative of fraud. He testified at trial that he engaged in this practice as a response to the financial crisis, but we did not find this testimony credible. The third badge of fraud thus supplies strong evidence of fraudulent intent.

4.    Concealing Income or Assets

A willful attempt to evade tax may be inferred from a taxpayer's conceal-ment of income or assets. Spies v. United States, 317 U.S. 492, 499 (1943). In addition to the jiggery-pokery displayed by his check-writing scheme, Dr. Kohan

[*23] attempted to conceal assets by showing his brother as the holder of title to the dental office building. But the evidence established that Dr. Kohan's brother was a mere nominee. When Dr. Kohan came under IRS investigation, his brother transferred title to the building to what seems to have been a shell corporation.

Dr. Kohan made large transfers during 2008 and 2009 to or for family members: roughly $46,000 to an organization controlled by his brother and roughly $130,000 to pay his mother's mortgage. He was not forthcoming about these expenditures at trial. These unexplained expenditures are consistent with Dr. Kohan's other efforts to conceal income and assets.

5.      Failing To Cooperate With Tax Authorities

Dr. Kohan did not cooperate with the IRS during the examination. He declined to produce the receipts book kept in the basement or the payment information included on patients' charts. He declined to produce the income and expense summaries that he supplied to Ms. Fan for use in preparing his tax returns. He refused to answer questions when the RA came to interview him. And he falsely told her that he leased the dental office building from a relative whom he refused to name.

Dr. Kohan and his wife were equally uncooperative with respondent after filing their petition. Respondent attempted discovery through informal requests

[*24] for documents and responses to interrogatories, but petitioners did not provide a single document to substantiate expenses underlying their claimed deductions. In March 2018 respondent filed, and we granted, motions to compel production of documents and responses to interrogatories, but petitioners again refused to respond. Cooperation began only a week before trial, when petitioners retained counsel. Although they ultimately conceded the deficiencies, they did so only after months of stonewalling and unjustified refusals to cooperate with respondent's counsel. This obstructive behavior is a clear badge of fraud.

6.      Providing Incomplete or Misleading Information

A taxpayer's provision of incomplete or misleading information to his return preparer--in particular, his concealment of gross income--provides strong circumstantial evidence of fraudulent intent. See Morse v. Commissioner, 419 F.3d at 833; Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), aff'g T.C. Memo. 1985-63; Vanover, 103 T.C.M. (CCH) at 1422. Dr. Kohan failed to provide Ms. Fan with complete information about his gross receipts, concealing payments his patients made by cash, check, and credit card. When Ms. Fan pressed him that his insured patients must have made copayments, he supplied her with guesstimates that were unsupported by his business records.

[*25] Dr. Kohan also gave Ms. Fan false information for use in preparing his payroll tax returns. He understated by more than 50% the wages he had paid Ms. Rodriguez and Ms. Vargas during 2009, and he concealed altogether the wages he had paid three part-time workers. This pattern of misrepresentation and concealment is a powerful index of fraud.

### 7. Lack of Credibility of Taxpayer's Testimony

We did not find Dr. Kohan to be a credible witness. He was often evasive or dismissive of questions that respondent and the Court asked of him. We have noted above numerous specific points on which we found his testimony to lack credibility. His overall defense--that Ms. Rodriguez and Ms. Fan were responsible for his underreporting of income--was equally implausible. Both of them testified at trial and were forthcoming about their responsibilities and interactions with Dr. Kohan. We find it inconceivable that either of them could or would have concocted unilaterally the systematic underreporting of income that he engineered.

### 8. Filing False Documents

Petitioners have stipulated that the income reported on their 2008 and 2009 returns was understated by more than $300,000 per year. These understatements were chiefly attributable to Dr. Kohan's failure to report payments his patients made by cash, check, and credit card. These omissions from gross income were

**[\*26]** large in dollar terms ($295,276 for 2008 and $244,787 for 2009) and in volume (188 distinct credit card payments in 2008 and 212 in 2009).

All of the checks and credit card payments were deposited into Dr. Kohan's personal bank account. He must have known that this income existed, in part because he spent it so liberally to fund his family's living expenses, his mother's mortgage payments, and generous transfers to religious organizations. And besides filing false income tax returns, he caused the filing of false Forms W-2 and W-3 by deliberately underreporting to Ms. Fan the wages he paid his employees.

C.    Petitioners' Arguments

No penalty is imposed with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith with respect thereto. See sec. 6664(c)(1). The taxpayer generally bears the burden of proving reasonable cause and good faith. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax professional. Sec. 1.6664-4(b)(1), (c), Income Tax Regs. To establish this defense the taxpayer must prove that: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer fully disclosed all relevant facts to the adviser; and (3) the taxpayer actually relied in good faith on

**[\*27]** the adviser's judgment. <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

Dr. Kohan contends that he reasonably relied on Ms. Rodriguez to keep his books and on Ms. Fan to prepare his tax returns. With respect to Ms. Rodriguez, petitioners offered no evidence to suggest that she had sufficient expertise to justify reliance. She had no background in accounting or tax law; she was not involved in the preparation of petitioners' 2008 and 2009 returns; and she credibly testified that she could not have assessed the accuracy of those returns if asked to do so.

Ms. Fan did have expertise in tax and accounting, but Dr. Kohan woefully failed to provide her with the information necessary to prepare petitioners' 2008 and 2009 tax returns correctly. Dr. Kohan testified that he relied on Ms. Rodriguez to supply accurate information to Ms. Fan, but Ms. Rodriguez acted at his direction. He instructed her to create a folder containing the insurance company Forms 1099-MISC, and he supplied this folder to Ms. Fan as the bedrock for his scheme to report only that stream of income. Ms. Rodriguez accurately recorded all payments in the patients' charts, but Dr. Kohan neglected to provide that information to Ms. Fan. <u>See</u> <u>Cole v. Commissioner</u>, T.C. Memo. 1998-452, 76 T.C.M

**[*28]** (CCH) 1055, 1059-1060 (finding fraud where doctor, in preparing tax returns, failed to use business records available to him).

Dr. Kohan asserted that he took a totally hands-off approach to the preparation of his tax returns, but the evidence did not support that assertion. He personally tallied up the Form 1099-MISC payments for 2009 and supplied the register tape to Ms. Fan. And he personally estimated his insured patients' copayments when Ms. Fan pressed him on that subject.

Ms. Fan might have been more aggressive in questioning Dr. Kohan about other payments his patients might have made by cash, check, or credit card. But even if she were thought to have turned a blind eye to the possible existence of additional income, that would not immunize Dr. Kohan from his deliberate and intentional failure to report that income to her. Because Dr. Kohan failed to show that he relied in good faith on the advice of a qualified tax professional, he is not entitled to relief from the fraud penalty under section 6664(c)(1).

In sum, we conclude that respondent has established by clear and convincing evidence that Dr. Kohan's underpayments of tax for 2008 and 2009 were attributable to fraud. Petitioners have failed to submit credible evidence showing that any portions of these underpayments were not due to fraud. We thus hold that

**[*29]** petitioners are liable for the tax deficiencies they have conceded and that Dr.

Kohan is liable for section 6663 civil fraud penalties for both years.[4]

To reflect the foregoing,

<u>An appropriate order and decision</u>

<u>will be entered for respondent</u>.

---

[4]Having concluded that Dr. Kohan is liable for the fraud penalty, we need not consider respondent's alternative determination of accuracy-related penalties against Dr. Kohan and his wife.